Alma Piston Company v. Commissioner. Emmet E. Tracy and Frances A. Tracy v. Commissioner.
Alma Piston Co. v. Commissioner
Docket Nos. 86564, 86976, 94661, 95180.
United States Tax Court
T.C. Memo 1963-195; 1963 Tax Ct. Memo LEXIS 149; 22 T.C.M. (CCH) 948; T.C.M. (RIA) 63195; July 23, 1963
Paul R. Trigg, Jr., 2746 Penobscot Bldg., Detroit, Mich., and Allan Neef, for the petitioners. Robert W. Siegel and Charles Abbott, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in tax of the petitioners as follows for the indicated years: Docket
Income
Accumulated
Petitioner
No.
Year
Tax
Earnings Tax
Alma Piston Company
86564
1954
$ 7,269.89
$123,189.47
1955
3,233.02
154,201.93
1956
5,319.33
111,403.22
95180
1957
13,618.38
184,092.79
1958
5,738.21
182,280.54
Emmet T. Tracy and Frances A. Tracy
86976
1954
1,527.02
1955
1,506.43
1956
2,555.99
94661
1957
2,662.50
1958
2,769.01
*151 In amendments to his answers in Alma Piston Company, Docket Nos. 86564 and 95180, filed at the hearing herein, the respondent alleged that the correct deficiencies in accumulated earnings tax are as follows for the indicated years and claimed an increase in the deficiency in accumulated earnings tax determined for each of the respective years: Accumulated
Year
Earnings Tax
1954
$125,988.38
1955
155,446.65
1956
113,451.16
1957
189,335.87
1958
184,489.75
Issues presented by the pleadings are the correctness of the respondent's action: (1) in determining that Alma Piston Corporation was availed of during the taxable years 1954 through 1958 for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed within the meaning of section 102 of the Internal Revenue Code of 1939 and sections 531-537 of the Internal Revenue Code of 1954; (2) in determining that deductions taken by Alma Piston Company in the amounts of $13,980.56, $6,217.34, $7,529.47, $5,219.18, and $5,641.01 for the years 1954 through 1958, respectively, as business expenses *152 with respect to property at Harbor Point, Michigan, were not allowable; (3) in determining that deductions taken by Alma Piston Company in the amount of $1,500 for each of the years 1956, 1957, and 1958 for expenditures made with respect to the college education of children of petitioners Emmet E. Tracy and Frances A. Tracy did not constitute allowable deductions; (4) in determining that $2,050 of the amount of the expenditures made by Alma Piston Company with respect to property at Harbor Point, Michigan, for each of the years 1954 through 1958, constituted income of the petitioners Emmet E. Tracy and Frances A. Tracy for the respective years taxable as dividends; and (5) in determining that the amounts of $1,500 expended in each of the years 1956, 1957, and 1958 by Alma Piston Company with respect to the college education of children of petitioners Emmet E. Tracy and Frances A. Tracy constituted income of such petitioners for the respective years taxable as dividends. In his reply brief the respondent concedes issues numbered 3 and 5, thereby leaving for determination issues numbered 1, 2, and 4. General Findings of Fact Some of the facts have been stipulated and are found *153 accordingly. Alma Piston Company, sometimes hereinafter referred to as Alma, is a Michigan corporation organized January 26, 1946, and has its principal office in Alma, Michigan. It filed its Federal corporation income tax returns for the years 1954 through 1958 on the calendar year basis with the district director in Detroit, Michigan. Emmet E. Tracy and Frances A. Tracy are husband and wife and reside in the City of Grosse Pointe Farms, Michigan. They filed their joint Federal income tax returns for the years 1954 through 1958 on the calendar year basis with the district director in Detroit, Michigan. Issue 1. Respondent's Determination That Alma Was Availed of During the Taxable Years in Issue for the Purpose of Avoiding the Income Tax With Respect to its Shareholders. Findings of Fact Petitioner Emmet E. Tracy was employed by Ford Motor Company, sometimes hereinafter referred to as Ford, from 1918 until about 1922. From 1928 to 1933 he was employed by Universal Credit Company, a subsidiary of Ford. From 1948 through 1955, he and his wife, petitioner Frances A. Tracy, owned a Lincoln-Mercury automobile agency in Grosse Pointe, Michigan. In December 1943, a partnership *154 known as Alma Piston Company, composed of Emmet E. Tracy and undisclosed others, was formed to produce automobile parts. For about 60 days prior to the formation of the partnership, Tracy had been contacted daily by Ford officials and he had been assured by them that he would get an order for the partnership from Ford. At that time Ford had machinery which was idle because of Ford's inability to operate it. In 1944, the partnership obtained a purchase order from Ford covering a 6-month period and an agreement with Ford that the partnership would produce parts for Ford as long as World War II lasted and that when the war ended the agreement would terminate and the machinery used by the partnership and owned by Ford would be returned to Ford which would resume manufacturing of the parts manufactured by the partnership. Following the end of the war, the partnership and subsequently mentioned successor partnerships, as well as Alma Piston Company, a corporation, following its organization in 1946, continued to manufacture parts for Ford. Since his contacts with Ford officials in 1943, Tracy has continued a close relationship with his contacts at Ford. A good part of his time is spent in *155 Detroit at Ford rather than at Alma Piston Company in Alma, Michigan. The time spent at Ford is devoted to maintaining close ties between Alma Piston Company and Ford. Tracy has successfully maintained those ties throughout the years and has gained many close friends in high executive positions at Ford. On May 31, 1945, Tracy created a trust of which his wife Frances A. Tracy was the trustee. The trust was for the benefit of their four children. The initial corpus of the trust consisted of $2,500 in cash. On May 31, 1945, the wife, as trustee of the foregoing trust and for $2,500, purchased 92 percent of the interest of Tracy in the abovementioned Alma Piston Company partnership. Thereupon on the same day, May 31, 1945, there was created a partnership known as Alma Piston Company composed of Tracy, his wife, individually and as trustee, Katherine T. Rolley, and undisclosed others. Thereafter and on January 26, 1946, there was created a new partnership known as Alma Piston Company composed of the following persons with the indicated capital interests therein: Capital Interest
Emmet E. Tracy
2 percent
Frances A. Tracy, trustee
23 percent
Frances A. Tracy, individually
25 percent
Katherine Rolley
50 percent
*156 The partnership created on January 26, 1946, was formed to and did acquire all the assets and business of the preceding partnership. On the date of its creation, the partnership created on January 26, 1946, entered into an agreement with Alma Piston Company, petitioner corporation herein, whereby the partnership transferred all of its assets and business, with the exception of $150,000 face value of its accounts receivable, to Alma for 953 shares, par value $100, of common stock in Alma and the assumption by Alma of all of the outstanding obligations of the partnership on January 26, 1946. Thereupon on January 26, 1946, Alma issued 953 shares of its stock to the partnership which in turn distributed the stock to its members as follows in proportion to their relative interests in the partnership: Total
No. of
par value
Stockholder
shares
of shares
Emmett E. Tracy
19.06
$ 1,906
Frances A. Tracy, trustee
219.19
21,919
Frances A. Tracy, individually
238.25
23,825
Katherine Rolley
476.50
47,650
Total
953.00
$95,300
The balance sheet of Alma immediately following the acquisition of the partnership assets in exchange for the 953 shares of Alma *157 stock and Alma's assumption of the liabilities of the partnership was as follows: CURRENT ASSETS: Cash
$ 5,391.73
Accounts Receivable
146,653.71
Inventories: Raw Material
$204,130.58
Tools
2,941.48
207,072.06
Total Current Assets
$359,117.50
Fixed Assets
21,332.81
Unexpired Insurance
3,672.13
Total Assets
$384,122.44
CURRENT LIABILITIES: Accounts Payable
$280,434.36
Accrued Expenses: Withholding tax
$2,238.76
Federal Excise Tax
6,176.81
Michigan Unemployment tax
549.49
Federal Unemployment tax
54.95
Social Security Tax
368.07
9,388.08
CAPITAL: Capital Stock
94,300.00
Total Liabilities
$384,122.44
On August 22, 1946, Alma purchased 318 of the 476.50 shares of its stock owned by Katherine Rolley for $42,266.54 and on August 5, 1948, purchased the remaining 158.50 shares of its stock owned by her for $55,000. Thereafter and throughout the taxable years in issue, the issued and outstanding stock of Alma was owned as follows: No. of
Percent
Stockholder
Shares
of Total
Emmet E. Tracy
19.06
4
Frances A. Tracy, trustee
219.19
46
Frances A. Tracy, individually
238.25
50
Total
476.50
100
*158 During the years in issue Alma's authorized stock consisted solely of common stock. Throughout the years in issue, the board of directors of Alma consisted solely of Tracy, his wife, and Paul R. Trigg, Jr. a. Tracy has been a director of Alma, as well as its president, treasurer, and general manager, throughout its existence. b. Frances A. Tracy has been a director of Alma throughout its existence and has also been its vice-president since August 22, 1946. c. Paul R. Trigg, Jr., has been a director of Alma since August 22, 1946, and has been its secretary since its organization except for the period of August 22, 1946, to August 5, 1948, when Katherine Rolley was secretary and he was assistant secretary. He is a member of a law firm practicing in Detroit, Michigan, and has been with this firm, or its predecessors, throughout Alma's corporate existence, and this law firm has acted as Alma's legal counsel throughout this period. d. Until August 5, 1948, Katherine T. Rolley and Elmer A. Rolley also were directors of Alma. No salaries have ever been paid by Alma to any of its officers or directors other than Tracy, who throughout the existence of the corporation has received *159 as compensation for his services as president and general manager a percentage of Alma's net profits before Federal income tax. In all but the initial year of the corporation, this compensation has been $9,000 plus 10 percent of the net profits before Federal income tax. Tracy has no drawing account with Alma. His compensation for a given taxable year is paid yearly in one lump sum after the close of the year, December 31, and usually on the 59th or 60th day following December 31. His compensation for the years in issue was as follows: 1954
$110,003.10
1955
129,518.16
1956
103,336.94
1957
145,281.06
1958
149,623.32
On November 19, 1946, Alma borrowed $30,000 from a bank in the town of Alma, Michigan. The note evidencing the indebtedness was renewed from time to time and paid in August 1949. Except for the foregoing loan, Alma at no time has borrowed money from banks or other lending agencies or institutions. From its inception, Alma uniformly has followed the practice of paying its trade accounts payable within the time for securing the usual discounts. Since 1946, Alma has never had a bad debt. Since 1946, Alma's employees have never been represented by *160 a union, nor since 1946, has there been a work stoppage at Alma because of employee grievances. During the taxable years in issue, Alma employed approximately 275 persons. During the taxable years in issue, Alma reflected on its books the operation of its divisions as follows: (a) the Genuine Parts Distributors Division was established in July 1949 to recondition certain parts for Ford automobiles and was operated throughout the years in issue, (b) the Alma Gear Division was established in October 1951 to manufacture timing gears for the Reo Motor Company and was discontinued in August 1956, and (c) the Alma Piston Company Division, in which was conducted the remainder of Alma's business, including its clutch manufacturing business and its timing gear manufacturing business for Ford and Willys Motor Company. Following the last of the taxable years in issue, Alma established in June 1959, the Genuine Parts Distributors - West Coast Division to act as a distributor of reconditioned Ford parts in California, Utah, and parts of Arizona and Wyoming. During its entire existence, Alma has had only 3 customers, namely, Ford, Willys Motor Company, and Reo Motor Company. Throughout that *161 time, more than 95 percent of Alma's total dollar sales were made to Ford. For each of the taxable years in issue, not less than 98 percent of Alma's total dollar sales were made to Ford, and at any given time during those years, not less than 98 percent of Alma's accounts receivable constituted money due Alma from Ford. Since 1944, the partnerships of which Alma Piston Company corporation is the successor, and the corporation itself following its organization in 1946, manufactured reconditioned used automobile clutches for Ford. Since 1950, the corporation has been the only manufacturer of reconditioned used clutches for Ford. Clutches are patented articles or incorporate patented components. Borg Warner Company holds all of the patents applicable to every clutch that has gone into any Ford automobile. As a condition to buying part of its clutches from Borg Warner, Ford has acquired from Borg Warner the right to sublicense other vendors of Ford under the Borg Warner patents and the clutches manufactured by Alma for Ford were manufactured by virtue of a sublicense from Ford. In 1946, the Long Manufacturing Company, a division of Borg Warner, manufactured all the production clutches, *162 that is, clutches installed in new automobiles used by Ford. Although Alma had attempted to obtain orders from Ford for production clutches, it had been unable to do so. In 1946, there was a strike at Long which lasted 1 day short of 6 months which prevented Long from supplying Ford with production clutches. During this period and at the request of Ford, Alma made and supplied to Ford all the production clutches the latter used during the period but, in doing so, Alma was unable to produce reconditioned clutches. From 1946 to 1952, Alma made approximately one-half of the production clutches used by Ford and also continued to make reconditioned clutches for Ford. In August 1952, another strike occurred at Long which continued into October of that year. During this strike Alma, at the request of Ford, again made for the latter all the production clutches used by the latter during the period of the strike and, in addition, made for Ford, production clutches for 90,000 new model cars to be placed on sale in the early fall of 1952. In so doing, Alma made no substantial number of reconditioned clutches. In 1954, a strike of about 4 weeks duration occurred at Long. During the strike Alma, *163 at the request of Ford, produced all of the latter's requirements for production clutches. Since 1954, only Long and Alma have supplied Ford with production clutches. On high volume jobs, 50 percent of Ford's requirements are purchased from Alma. On low volume jobs, jobs involving less than 100 clutches daily, 100 percent are purchased from Long. Approximately 10 percent of Ford's purchases of production clutches in a given year are devoted to low volume jobs. Both production and reconditioned clutches are made on the same machine. In the manufacture of production clutches, Alma purchases castings and stampings and machines these in the usual manner and a completely new assembly or clutch is produced. Upon completion of manufacture, the production clutches are shipped by Alma to various Ford assembly plants where they are installed only in new Ford automobiles or motor vehicles. In the manufacture of reconditioned used clutches, used clutches which have been received by Ford dealers in exchange for new clutches are collected from the dealers by a Ford representative and accumulated in such numbers that shipments thereof can be made at the lowest possible freight rate. The used *164 clutches are then shipped to Alma at Alma, Michigan, where upon their receipt they are completely disassembled by Alma. The disassembled parts which are worn and not meeting Ford's blueprint specifications are scrapped. Some parts are machined again and new parts are added. The parts are then reassembled into a reconditioned clutch which is sold to Ford and sent out for sale to Ford customers. Prior to 1954, Alma purchased the used clutches which it reconditioned but, during the years in issue and since, such used clutches have been the property of Ford and have not been included in Alma's inventory. During the above-mentioned strikes at Long in 1946 and 1952, while Alma was manufacturing all of Ford's requirements for production clutches and was producing no or no substantial quantity of reconditioned clutches, Alma, at the request of Ford, in addition to ordering and receiving shipments of materials and parts for the manufacture of production clutches, also continued to receive from its suppliers shipments of previously placed orders for materials and parts for reconditioning used clutches. In so doing, Alma accumulated substantial inventories of material for producing reconditioned *165 clutches when the strikes ended. In 1949, Alma began rebuilding small parts such a carburetors, fuel pumps, starters, generators, voltage regulators, etc., totaling about 12 different items. This phase of Alma's business is done only in areas where Alma has been authorized by Ford. The small parts are collected at the same time used clutches are collected by Ford for reconditioning and are shipped to Alma's plant in Alma, Michigan, where they are rebuilt and reworked and distributed to dealers by Alma and not through Ford. During the years in issue, Alma's sales of rebuilt small parts constituted less than 10 percent of its total sales. Ford introduced an automatic transmission in the 1951 model year cars produced by it. A clutch is not utilized in an automatic transmission installed in Ford automobiles. Of Alma's total dollar sales to Ford during the years in issue, 95 percent were sales of production and reconditioned clutches. The following is a statement of Ford's requirements for production clutches and reconditioned clutches for the years 1950 through 1960: Number
Number of
Total
of produc-
reconditioned
number
Year
tion clutches
clutches
of clutches
1950
2,388,000
1,695,000
4,083,000
1951
1,508,000
1,340,000
2,848,000
1952
776,000
1,361,000
2,137,000
1953
1,674,000
1,141,000
2,815,000
1954
1,392,000
1,033,000
2,425,000
1955
1,274,000
1,146,000
2,420,000
1956
1,088,000
1,135,000
2,223,000
1957
1,004,000
1,155,000
2,159,000
1958
642,000
1,086,000
1,728,000
1959
886,000
1,112,000
1,998,000
1960
1,072,000
1,102,000
2,174,000
*166 The following is a statement of the number of production clutches and reconditioned clutches sold by Alma to Ford during the years 1950 through 1960: Number
Number of
Total
of produc-
reconditioned
number
Year
tion clutches
clutches
of clutches
1950
1,194,000
1,695,000
2,889,000
1951
754,000
1,340,000
2,094,000
1952
388,000
1,361,000
1,749,000
1953
837,000
1,141,000
1,978,000
1954
696,000
1,033,000
1,729,000
1955
637,000
1,146,000
1,783,000
1956
544,000
1,135,000
1,679,000
1957
502,000
1,155,000
1,657,000
1958
321,000
1,086,000
1,407,000
1959
443,000
1,112,000
1,555,000
1960
536,000
1,102,000
1,638,000
The following is a statement showing the total number of passenger cars produced by the United States automotive industry and the number and percentage thereof produced with automatic transmissions for the model years 1946 through 1961: Number
Percentage
of pas-
of passenger
senger cars
cars pro-
Total
produced
duced with
number of
with auto-
automatic
Model
passenger
matic trans-
trans-
Year
cars produced
missions
missions
1946
2,221,222
113,727
5.12
1947
3,337,393
224,941
6.74
1948
4,134,611
561,480
13.58
1949
5,382,597
870,905
16.18
1950
6,459,625
1,605,218
24.85
1951
5,994,267
2,089,004
34.85
1952
3,799,701
1,536,979
40.45
1953
6,086,975
2,550,443
41.90
1954
4,846,325
2,751,259
56.77
1955
7,136,496
4,879,223
68.37
1956
6,295,580
4,726,866
75.08
1957
6,210,735
4,915,468
79.14
1958
4,222,781
3,275,035
77.55
1959
5,566,527
4,215,242
75.72
1960
6,011,482
4,309,041
71.68
1961
5,407,401
3,939,291
72.85
*167 The following is a statement showing for the automobile model years 1959 through 1961 the total number of "Compact" automobiles produced by the United States automobile industry and the number and percentage of "Compacts" produced with automatic transmissions: Percentage
Number
of compacts
of compacts
produced
Number of
produced with
with auto-
Model
compacts
automatic
matic trans-
year
produced
transmissions
missions
1959
377,483
164,394
43.55
1960
1,125,431
568,793
50.54
1961
1,381,994
813,856
58.89
Throughout the years in issue as well as since, the clutch has been standard equipment in cars produced by Ford. An automatic transmission has been optional equipment and has been available to buyers at an extra price in excess of $100. The following is a statement of the number of passenger cars produced by Ford Division of Ford for the model years 1949 through 1960 and the number and percentage thereof produced with automatic transmissions: Percentage
Pas-
of passenger
senger cars
cars pro-
produced
duced with
with auto-
automatic
Model
Passenger
matic trans-
trans-
Year
cars produced
missions
missions
1949
1,082,266
1950
1,193,773
1951
979,552
224,918
22.96
1952
644,682
255,801
39.68
1953
1,215,747
378,084
31.10
1954
1,135,623
439,397
38.69
1955
1,415,406
777,471
54.93
1956
1,435,549
891,487
62.10
1957
1,645,422
1,143,407
69.49
1958
964,588
642,689
66.63
1959
1,442,318
998,429
69.22
1960
1,415,618
878,841
62.08
*168 During the years in issue all Ford trucks used clutches. Unit factory sales of Ford trucks from Ford's United States plants for the years 1954 through 1959 were as follows: Year
Number of trucks sold
1954
303,380
1955
373,639
1956
295,517
1957
339,400
1958
242,906
1959
347,151
Clutches required by Ford for tractors are ordered on a blanket order basis. The orders are issued and are in effect for a period of 2 years and are renewed at the end of each 2-year period for an additional 2-year period. The Tractor and Implement Division of Ford during the years in issue procured all of its clutch requirements from Alma and Long. Clutches required for original equipment (new) vehicles were procured 50 percent from Alma and 50 percent from Long. Reconditioned clutches for prior year models were obtained 100 percent from Alma. During the years in issue, Ford tractors did not use an automatic transmission. During the years in issue, the Tractor and Implement Division of Ford never considered obtaining clutches from any supplier other than Alma and Long. The Tractor and Implement Division produced the following number of tractors during the indicated years: *169 Year
Number of tractors
1954
63,582
1955
86,361
1956
49,767
1957
39,658
1958
46,315
The following is a statement of Ford's total purchases in dollars from Alma for the years 1954 through 1959: Year
Amount
1954
$6,877,000
1955
7,053,000
1956
6,546,000
1957
$7,662,000
1958
7,762,000
1959
8,283,000
Alma's monthly production of production clutches is greatest during the months of October and November and its monthly production of reconditioned clutches is greatest during November, December, and January. During the years in issue, Alma frequently increased the prices which it charged Ford for production clutches and reconditioned clutches which it sold to Ford. It was the practice of Ford throughout the years in issue on each occasion when Alma requested a price increase to subject the requested price increase to an analysis by its Price Analysis Department before approval of a new price. During the period when a requested price increase was thus in the process of analysis at Ford, it was the policy of Ford not to pay invoices which reflected the requested price increase. In such cases Ford would pay invoices at the old price *170 but not at the requested new price. During the period of such analysis, Ford expected its suppliers to continue to ship the parts involved. Prior to 1956, Alma continued to ship clutches to Ford during the periods when a price increase was pending with Ford and concurrently with the shipment invoiced the clutches to Ford at the old price. Beginning in 1956 and after some disagreeable experiences under the foregoing procedure, Alma continued to ship clutches to Ford but withheld invoicing them until the new price was approved even though this meant that Alma would not receive any payment therefor until the new price was approved. Ford preferred in cases of price revisions that its vendors withhold invoices pending approval of the price increases and the management of Alma was aware of that preference. There were other vendors of Ford who also followed the practice of not rendering invoices for items shipped to Ford during the period when requested price increases were under consideration by the Price Analysis Department of Ford. From time to time during the years in issue, Alma received from Ford open purchase orders for newly designed clutches for which no price had been established *171 under which Alma produced and shipped clutches. It was the practice of Ford whenever a new price was to be established to request a price quotation from the supplier and to subject such price quotation to an analysis by its Price Analysis Department before approval of the new price. While the quoted price was under consideration, Ford made no payments although it required the supplier to ship clutches under the open purchase order. During the years in issue, the average period of time required for the approval of a requested price increase by Ford or for the establishment of a new price was 2 months. Approval of a price increase or new price was reflected by a formal amendment by Ford of its outstanding purchase order to Alma. The internal processing of an amendment to a purchase order at Ford during the years in issue took from 7 to 10 days following the approval of the price increase by Ford. It was Ford's practice throughout the years in issue to issue checks in payment of Alma's invoices on or shortly after the 20th day of the month following the month in which the invoice was received by Ford. As a result of its experience with Ford prior to the years in issue in obtaining *172 requested price increases, it was the policy of Alma's management throughout the years in issue to determine the required amount of Alma's working capital on the basis that Alma might be required to ship production clutches and reconditioned clutches to Ford for a period of 3 months before sending invoices covering the same, either by reason of a pending request for price increases or by reason of a delay in establishing a new price or both. On September 28, 1956, Alma requested a price increase of Ford to be effective October 1, 1956. The price increase was general and covered all production and reconditioned clutches. The price increase was approved by Ford on November 30, 1956. Alma continued to ship both production and reconditioned clutches during October and November without invoicing them. The purchase order amendment was received by Alma in December and it thereupon invoiced Ford. Invoices covering the interim shipments were paid by Ford on January 20, 1957, which was the normal payment date for invoices received in December. During the period from September 30, 1956 to December 31, 1956, Alma's cash decreased from $1,736,576.50 to $478,832.17, or by $1,257,744.33, and its *173 accounts receivable from customers increased from $707,688.35 to $1,830,856.90, or by $1,123,168.55. On December 31, 1956, Alma had an excess of United States Treasury notes over Federal income tax liability accrued of $155,811.73 which, when added to its cash of $478,832.17, left only $634,643.90 available to cover $717,367.51 of current liabilities, exclusive of Federal income tax accrued, and approximately $75,000 of payroll expense for the first 3 weeks of January 1957. On September 16, 1957, Alma requested a price increase of Ford to be effective October 1, 1957. The price increase was general and covered all production and reconditioned clutches. The price increase was approved by Ford on November 27, 1957. The purchase order amendment was received by Alma in December and it thereupon invoiced Ford. Invoices covering the interim shipments were paid by Ford on or after January 20, 1958, which was the normal payment date for invoices received in December. During the period from September 30, 1957, to December 31, 1957, Alma's cash decreased from $2,450,990.52 to $709,205.75, or by $1,741,784.77 and its accounts receivable from customers increased from $776,461.55 to $2,117,052.66, *174 or by $1,340,591.11. On December 31, 1957, United States Treasury notes held by Alma were less than the Federal income tax liability accrued and consequently it had only its cash of $709,205.75 available to cover $769,544.60 of current liabilities, exclusive of Federal income tax accrued, and approximately $75,000 of payroll expense for the first 3 weeks of January 1958. During 1950, Tracy informed the other directors of Alma that he had been informed by Ford executives that in February 1951, Ford would begin production in large volume of automatic transmissions for automobiles manufactured by it, that at that time Ford's orders to Alma for production clutches would be reduced by 25 percent and further reduced as the production of automatic transmissions increased, and that Ford planned a steady increase in the production of automatic transmissions unless sales difficulties should be encountered. Following the introduction of the 1951 Ford automobile equipped with an automatic transmission, Tracy informed the other directors of Alma that he had been informed by Ford executives that Ford planned to equip automobiles manufactured by it with automatic transmissions as fast as it could *175 provide facilities for making such transmissions. In December 1953, Ford had under construction a new plant for the manufacture of automatic transmissions. At that time, Tracy reached the considered opinion that with the completion of the plant and the increased production of automatic transmissions by Ford and the resulting decline in Ford's requirements for production clutches, Alma eventually would be put out of business. He so informed the other directors of Alma. In 1954, Tracy informed the other directors of Alma that Ford's plans were to further increase the number of automatic transmissions manufactured by it to the point where in the near future it could equip 75 percent of the total number of automobiles manufactured by it annually with automatic transmissions. In pursuance of its plans, Ford, in 1955, completed construction of a new plant in Michigan and began construction of another plant in Ohio for the manufacture of automatic transmissions. This information also was given by Tracy to Alma's other directors in 1955. Since the installation by Ford of automatic transmissions in an increasing proportion of the total automobiles produced by it correspondingly eliminated *176 the use of production clutches and made certain that there would be less clutches which eventually might be reconditioned, Alma, as early as 1950, was faced with a situation which not only presented no prospects for an increase in the manufacture and sale of clutches to Ford, but definitely showed prospects of a substantial decline with the possible eventual end of profitable operations. As the popularity of and demand for automobiles equipped with automatic transmissions greatly increased over the following years, the situation became more acute with Alma. Faced with such a situation Alma in 1951 gave further consideration to the matter of a diversification of its products, which it formerly considered but had never decided upon. With the decline in the number of clutches sold after 1950, Alma engaged in an effort to locate and acquire some business or properties or both which would enable it to replace the decline in the number of its clutches sold to Ford. In its search for such business or properties, Alma sought primarily for something connected with the metal-working business or that could be integrated with the metalworking business and preferably something connected with the *177 automobile business since the directors of Alma thought it had good connections to which it could sell automobile parts. In 1953, Alma, through extensive advertising and through various business brokers, intensified its effort to acquire some business or properties which would enable it to replace the decline in the volume of its clutch sales to Ford. Such intensified effort continued through the years in issue. Although over the years numerous businesses and properties were investigated and examined, comparatively few proved to be of the type desired by Alma and of those of the type desired practically none proved actually to be available on terms or conditions, financial or otherwise, which Alma was able or willing to assume. On several occations prior to the end of 1955, Alma submitted to Ford a plan whereby Alma would be the source of supply to Ford of reconditioned automatic transmissions as it was with respect to reconditioned clutches. Due to a division of opinion among executives of Ford as to the proposed plan, it was not accepted by Ford. During the period 1954 to May 1958, Meyer & Welch Company, Los Angeles, California, sometimes hereinafter referred to as Meyer Welch, *178 under a Ford franchise held by it, was engaged in the business of rebuilding engines and reconditioning other autmobile parts and distributing them to Ford dealers in California, Utah, and parts of Arizona and Wyoming, for subsequent sale to retail customers. Lewis W. Welch, sometimes hereinafter referred to as Welch, was president of Meyer Welch. In pursuance of Alma's efforts to obtain other business or properties to replace the decline in the number of its clutches sold to Ford, Tracy in the summer of 1956 contacted H. D. Hubbs, who was parts and accessories sales manager of Ford and as such was in charge of all of the reconditioning and warehouse distributing functions of Ford, and inquired if there were available any Ford franchises similar to that Alma then had from Ford. Hubbs informed Tracy that Welch shortly before had informed him (Hubbs) that Meyer Welch was interested in selling its Ford franchise and that he (Hubbs) was of the opinion that the price might be quite high. By December 1956, Tracy had received a report that the selling price asked by Meyer Welch for its business and properties was $1,500,000 subject to inventory adjustments. During 1957, Alma's representative *179 entered into negotiations in Michigan with Welch respecting the purchase of the Meyer Welch business and properties. Meyer Welch was in financial difficulties at the time and the possibility of a purchase of its business and properties appeared to be good. The negotiations reached the point where, because of the size of the selling price asked, Alma, contingent upon being granted a lease upon the buildings and other real estate, offered to purchase the business and other properties. After negotiations had continued for a time they were terminated in the summer of 1957 by Welch's decision not to lease the buildings and other real estate but to sell the business and properties as "one package" because of his need for money. Tracy reported to Hubbs the result of these negotiations with Welch and learned that Ford's sales in California of reconditioned parts had declined as a result of restricted operations by Meyer Welch. During the latter part of November 1958, Alma learned that Welch was actively trying to sell the Meyer Welch business and properties. It contacted Welch in Los Angeles, California. Upon his return from Los Angeles, Alma's representative reported to Tracy that Welch *180 was in financial difficulties and in need of cash and had stated that he would accept $1,250,000 cash for the Meyer Welch business and properties and that the full amount of the cash must be made available immediately. Tracy purchased a cashier's check for $1,250,000 from a Detroit bank and the representative returned with the check to Los Angeles. He remained in Los Angeles until December 24, 1958, when he returned to Michigan and reported to Tracy that Welch had changed the price and was asking $1,400,000 for the business and properties. Late in December 1958, Welch requested Alma's representative to return to Los Angeles as he (Welch) was ready to do business and that he would be able to arrange a selling price of $1,250,000. Shortly after January 1, 1959, Tracy went to see Welch in Los Angeles. Upon his arrival Welch stated that he would sell the Meyer Welch business and properties for $1,250,000 but that in addition certain other properties must also be purchased at prices which would require the cash payment to Welch to be increased from $1,250,000 to approximately $1,400,000. The proposal was not acceptable to Tracy and he returned to Michigan. The negotiations thereafter were *181 resumed and continued until about the end of March without the parties having been able to reach an agreement. The business and properties of Meyer Welch were so heavily encumbered that a selling price of $1,250,000 was insufficient to discharge the encumbrances and permit the transfer of a clear title of them. In April 1959, Meyer Welch closed two of its branches and ceased to give service theretofore given therefrom to Ford dealers. On April 27, 1959, Welch met with Hubbs in Detroit at which time Hubbs requested that Meyer Welch resign its Ford franchise and agreed that Ford would purchase back all parts and finished inventory of Meyer Welch. Meyer Welch did not resign the franchise and Ford terminated it. On June 1, 1959, Alma signed a franchise agreement with Ford granting Alma the exclusive right to rebuild and recondition Ford automobile parts and distribute them to Ford dealers in the territory formerly covered by the Meyer Welch franchise and sometimes hereinafter referred to as the West Coast territory. A condition for Ford granting the franchise to Alma was the latter's agreement to provide a complete and modern rebuilding or reconditioning plant or plants and to establish *182 not less than four warehouses strategically located in the territory, purchase a fleet of new Ford trucks, and to purchase a sufficient stock of all parts to properly service all Ford dealers in the territory on a weekly basis. During the time of the negotiations for the purchase of the Meyer Welch business and properties and afterwards until Alma's acquisition of the Ford franchise of June 1, 1959, the directors of Alma discussed the financial outlay that would be required for Alma to assume the Meyer Welch operations. About March or April 1959, Tracy prepared and submitted to Alma's other directors, who gave consideration thereto, a detailed estimate of the investment required for the purpose which totaled approximately $2,550,000 and related to manufacturing facilities, inventory, equipment, and warehouses, as well as working capital requirements. After the termination by Ford of the Meyer Welch franchise, Alma sought to purchase all the properties of Meyer Welch except its real estate but was unable to do so because Welch insisted on the sale of all of the properties as a "package." However, Ford took back all of the automobile parts and Alma subsequently purchased them from *183 Ford. Alma owned the plant it occupied in Ahna, Michigan, which it constructed around 1947 to 1950. About July or August 1959, Alma began operations under the Ford franchise of June 1, 1959, in buildings which it rented about the date of the franchise. In its operations under the franchise Alma, by December 1959, had invested approximately $800,000 in machinery and inventories of automobile parts. By December 1961, Alma had made a total investment of $1,302,362 with respect to operations under the franchise of June 1, 1959, and Tracy anticipated that a further outlay of $1,100,000 would be required in order to completely carry out the agreement it made with Ford at the time it acquired the franchise. Neither Tracy nor any member of his family has ever borrowed any money from Alma. Nor at any time during the years in issue did Alma own securities issued by any private or governmental entity except certain United States Government notes or bonds which for most of the years in issue were in lesser amounts than Alma's currently accrued but unpaid income taxes. The following is a statement of Alma's net sales, net income after income tax and dividends paid during the years 1946 through *184 1959 and its total retained earnings at the end of the years 1946 through 1959: Net Income
Total
After
Dividends
Retained
Year
Net Sales
Income Tax
Paid
Earnings
1946
$2,288,393.69
$211,400.34
$ 200,933.80
1947
3,711,001.56
248,185.36
$100,000.00
348,725.81
1948
4,989,562.19
523,647.79
100,000.00
726,504.15
1949
5,592,351.41
555,833.83
110,071.50
1,172,266.48
1950
7,356,291.03
632,447.70
100,000.00
1,708,126.89
1951
7,590,489.85
414,785.69
100,000.00
2,023,627.45
1952
7,384,588.10
386,159.54
100,000.00
2,309,786.99
1953
7,664,090.75
396,870.44
100,000.00
2,606,657.43
1954
7,614,991.92
441,833.41
100,000.00
2,950,294.39
1955
8,153,174.22
526,153.60
100,000.00
3,183,561.99
1956
$8,085,821.62
$413,044.14
$100,000.00
$3,508,088.13
1957
8,342,156.35
594,273.83
100,000.00
4,030,219.96
1958
7,397,068.15
613,270.73
100,000.00
4,585,429.69
1959
9,544,433.27
485,211.86
100,000.00
1,020,929.79 [1]
*185 The following is a condensed comparative balance sheet for Alma for the taxable years ended December 31, 1953, through December 31, 1959, and a statement of the ratio of current assets to current liabilities at the end of the respective years: 1953
1954
1955
1956
Current Assets
Cash on hand and in banks
$ 957,567.29
$1,241,573.11
$1,550,275.50
$ 478,832.17
U.S. Treasury notes or certificates
300,000.00
300,000.00
475,000.00
500,000.00
Accounts receivable
941,607.09
1,292,686.75
1,222,417.29
1,830,916.90
Inventories
1,037,841.51
696,633.97
846,094.91
1,169,348.38
Prepaid insurance, taxes, etc.
5,538.25
5,332.66
5,668.02
6,798.16
Container deposits
11,383.17
7,945.40
11,514.35
10,306.59
Accrued interest receivable
3,715.96
9,015.38
4,039.44
4,218.75
Total current assets
$3,257,653.27
$3,553,187.27
$4,115,009.51
$4,000,420.95
Other Assets
21,000.00
21,000.00
21,000.00
21,354.96
Fixed Assets
783,435.58
748,585.07
747,497.47
789,292.24
Total assets
$4,062,088.85
$4,322,772.34
$4,883,506.98
$4,811,068.15
Current Liabilities
Accounts payable
$ 733,319.12
$ 604,077.12
$ 678,117.96
$ 431,751.16
Customers' deposits
920.00
18,662.00
Withholding tax deductions
55,320.60
53,556.45
62,808.90
66,785.40
Accrued expenses including Fed-
eral income tax
607,282.90
655,218.82
705,191.89
544,357.22
Employees' deductions
1,341.56
1,458.32
Total current liabilities
$1,397,264.18
$1,314,310.71
$1,447,038.75
$1,061,555.78
Other Liabilities
Reserve for pension retirement plan - unfunded liability
194,739.00
183,257.00
Deferred Federal income tax
Total other liabilities
$ 194,739.00
$ 183,257.00
Capital Stock and Surplus
Common stock issued
47,650.00
47,650.00
47,650.00
47,650.00
Capital surplus
10,517.24
10,517.24
10,517.24
10,517.24
Retained earnings
2,606,657.43
2,950,294.39
3,183,561.99
3,508,088.13
Total capital stock and surplus
$2,664,824.67
$3,008,461.63
$3,241,729.23
$3,566,255.37
Total liabilities, capital stock,
and surplus
$4,062,088.85
$4,322,772.34
$4,883,506.98
$4,811,068.15
Ratio of current assets to current lia-
bilities
2.33
2.70
2.84
3.77
Current Assets
Cash on hand and in banks
$ 709,205.75
$2,095,568.69 [1]
$1,383,668.03
U.S. Treasury notes or certificates
500,000.00
500,000.00
500,000.00
Accounts receivable
2,117,322.66
1,463,102.22
1,730,258.68
Inventories
1,206,893.01
899,404.21
1,622,983.16
Prepaid insurance, taxes, etc.
6,922.58
36,408.83
59,725.25
Container deposits
12,333.24
2,236.07
16,415.18
Accrued interest receivable
2,236.11
13,880.68
2,236.03
Total current assets
$4,554,913.35
$5,010,600.70
$5,315,278.33
Other Assets
21,000.00
21,000.00
221,000.00
Fixed Assets
949,673.17
954,224.07
982,961.47
Total assets
$5,525,586.52
$5,985,824.77
$6,519,239.80
Current Liabilities
Accounts payable
$ 425,055.91
$ 435,615.90
$ 662,814.25
Customers' deposits
8,643.90
9,992.90
18,346.90
Withholding tax deductions
72,574.60
76,983.40
63,088.83
Accrued expenses including Federal in-
come tax
775,525.91
689,093.64
608,481.03
Employees' deductions
Total current liabilities
$1,281,800.32
$1,211,685.84
$1,352,731.01
Other Liabilities
Reserve for pension retirement plan - un-
funded liability
155,399.00
113,460.00
129,459.00
Deferred Federal income tax
17,082.00
16,120.00
Total other liabilities
$ 155,399.00
$ 130,542.00
$ 145,579.00
Capital Stock and Surplus
Common stock issued
47,650.00
47,650.00
4,000,000.00
Capital surplus
10,517.24
10,517.24
Retained earnings
4,030,219.96
4,585,429.69
1,020,929.79
Total capital stock and surplus
$4,088,387.20
$4,643,596.93
$5,020,929.79
Total liabilities, capital stock, and sur-
plus
$5,525,586.52
$5,985,824.77
$6,519,239.80
Ratio of current assets to current liabilities
3.55
4.10
3.90
*186 In their joint Federal income tax returns for 1954 through 1958, petitioners Emmet E. and Frances A. Tracy reported taxable income as follows: Year
Amount
1954
$120,280.50
1955
119,713.49
1956
93,847.19 [1]
1957
106,349.48
1958
131,152.84
On November 17, 1959, the respondent, pursuant to section 534(b) of the 1954 Code, notified Alma that a proposed notice of deficiency for the years 1954, 1955, and 1956 included an amount with respect to the accumulated earnings tax imposed by section 531 of the Code. On January 14, 1960, Alma, pursuant to section 534(c) of the Code, submitted to respondent a statement in which it set forth stated grounds and facts on which those grounds were based for the accumulation of earnings. On March 22, 1960, respondent notified Alma of a determination, pursuant to section 531, of the deficiencies in controversy for the years 1954, 1955, and 1956. On December 29, 1960, the respondent, pursuant to section 534(b) of the *187 1954 Code, notified Alma that a proposed notice of deficiency for the years 1957 and 1958 included an amount with respect to the accumulated earnings tax imposed by section 531 of the Code. On February 27, 1961, Alma, pursuant to section 534(c) of the Code, submitted to respondent a statement in which it set forth stated grounds and facts on which those grounds were based for the accumulation of earnings. On September 13, 1961, respondent notified Alma of a determination, pursuant to section 531, of the deficiencies in controversy for the years 1957 and 1958. During 1954 through 1958, Alma did not accumulate earnings and profits beyond the reasonable needs of its business, including reasonably anticipated needs, and was not availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Opinion Sections 531 and 532 of the Code of 1954 impose an additional tax designated an accumulated earnings tax upon a corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation by permitting *188 earnings and profits to accumulate instead of being divided or distributed. The issue here is whether Alma was availed of during its taxable years 1954 through 1958 for the purpose of avoiding the income tax with respect to its shareholders within the meaning of the abovementioned sections. The question is one of fact. Helvering v. National Grocery Co., 304 U.S. 282 (1938); James M. Pierce Corporation, 38 T.C. 643 (1962), on appeal (C.A. 8, Jan. 10, 1963). The fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business is determinative of the proscribed purpose unless the corporation by the preponderance of the evidence shall prove to the contrary. Section 533. Section 537 provides that the term "reasonable needs of the business" includes the reasonably anticipated needs of the business. Section 534 imposes the burden of proof on the respondent on the factual matters set forth in petitioners' statement if the corporation has submitted to the respondent a statement of the grounds and facts on which it relies to show there was no accumulation beyond reasonable needs. In view of the record presented *189 we deem it unnecessary to decide the burden question. The position of the petitioners is that the earnings and profits accumulated by Alma during the years in issue were accunfulated to provide it (1) with additional working capital to carry peak amounts of accounts receivable arising from delays by Ford in approving initial prices for newly designed clutches and in approving price increases for other clutches, and (2) to provide capital for the diversification of Alma's product line necessitated by the fact that after the introduction by Ford in 1951 of automobiles equipped with automatic transmissions, Alma's clutch business was a declining industry. The respondent takes the position (1) that Alma's accumulated earnings of $2,606,657.43 on December 31, 1953, provided during the years in issue were adequate and sufficient working capital for Alma's reasonably anticipated needs, and (2) that there never existed during the years in issue any specific plan for expansion or diversification of Alma's business which, in the exercise of sound judgment, warranted the accumulation of Alma's earnings or profits in a reasonably definite amount. Respecting reasonable needs of the business, *190 section 1.537-1, Income Tax Regulations, provides in pertinent part as follows: § 1.537-1 Reasonable needs of the business. (a) In general. * * * An accumulation of the earnings and profits (including the undistributed earnings and profits of prior years) is in excess of the reasonable needs of the business if it exceeds the amount that a prudent businessman would consider appropriate for the present business purposes and for the reasonably anticipated future needs of the business. The need to retain earnings and profits must be directly connected with the needs of the corporation itself and must be for bona fide business purposes. * * * The extent to which earnings and profits have been distributed by the corporation may be taken into account in determining whether or not retained earnings and profits exceed the reasonable needs of the business. * * * (b) Reasonable anticipated needs. (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, *191 and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business. (2) Consideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year. Thus, subsequent events shall not be used for the purpose of showing that the retention of earnings of profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are present at the close of such taxable year. However, subsequent events may be considered to determine whether the taxpayer actually intended to consummate *192 or has actually consummated the plans for which the earnings and profits were accumulated. In this connection, projected expansion or investment plans shall be reviewed in the light of the facts during each year and as they exist as of the close of the taxable year. If a corporation has justified an accumulation for future needs by plans never consummated, the amount of such an accumulation shall be taken into account in determining the reasonableness of subsequent accumulations. Viewing Alma's situation during the years in issue in the light of respondent's regulation that an accumulation of earnings and profits is in excess of the reasonable needs of the business if it exceeds the amount that a prudent businessman would consider appropriate for the present business purposes and for the reasonably anticipated future needs of the business, the problem presented here is to determine the amount of the accumulated earnings and profits at the end of the respective years in issue that a prudent businessman would consider appropriate for the business purposes of Alma, including reasonably anticipated future needs. Prior to and during the years in issue, Ford essentially was Alma's only *193 customer for Alma's single product - clutches. Borg Warner owned the patents under which clutches used by Ford were manufactured. Under an agreement between Borg Warner and Ford respecting the patents, Long Manufacturing Co., a division of Borg Warner, manufactured one-half of Ford's requirements for production clutches and all of Ford's requirements for production clutches for low volume jobs. Under the agreement between Borg Warner and Ford, the latter was authorized to license and engage Alma to manufacture the remainder of Ford's requirements for production clutches and to recondition used clutches for Ford. In such a situation it is apparent that the lifeblood of Alma was the business obtained by it under its arrangement with Ford. By having available two sources - Long Manufacturing Company and Alma - from which to obtain production clutches, Ford, except in case of strikes and other emergencies at one, was not solely dependent on either for a continued supply of clutches. Also, a further benefit to Ford was that it put the two sources in competition with each other in approving the initial prices it would pay for newly designed clutches and in approving the price increases it *194 would pay for other clutches. During the years in issue, the average period elapsing between the time of a request for a price increase or for the establishment of a new price and the time of approval therefor by Ford was 2 months. The request made by Alma on September 28, 1956, for a price increase effective October 1, 1956, was not approved until November 30, 1956, and a request for a price increase effective October 1, 1957, made on September 16, 1957, was not approved until November 27, 1957. After Ford's approval of a price increase, from 7 to 10 days were required for the internal processing by Ford of purchase orders to reflect the increased price or prices. Prior to 1956 and while consideration of a price increase was pending before Ford, Alma shipped clutches to Ford and concurrently with the shipment invoiced the clutches to Ford at the old price. Ford currently made payment for the clutches at the old price but, in approving a price increase, it made the increase effective as to clutches invoiced after the date of approval of the increased price. This resulted in Alma having to bear the additional manufacturing costs of clutches manufactured and shipped during the period *195 in which the request for an increase in price or prices was pending before Ford. To avoid this Alma, in 1956 and later years, continued to ship clutches but deferred invoicing them until after Ford's approval of a price increase. By the latter practice, Alma passed on to Ford its increased manufacturing costs arising during the period a request for an increased price was pending before Ford. Although the latter practice enabled Alma to obtain the increased price for the clutches theretofore shipped, it also required considerably more working capital for Alma. Despite the fact that Alma had accumulated earnings and profits for the years 1954 and 1955, here in controversy, our findings show that because of Ford's delay in approving requested increased prices, Alma at December 31, 1956, had current assets of only $634,643.90 to cover current liabilities of $717,367.51, exclusive of income tax, and payroll expenses of approximately $75,000 for the first 3 weeks of January 1957, and that at December 31, 1957, Alma had current assets of only $709,205.75 to cover current liabilities, exclusive of income tax, of $769,544.60 and approximately $75,000 of payroll expenses for the first 3 weeks *196 of January 1958. Concededly a corporation is not required actually to suffer a working capital problem which requires it to resort to borrowing in order to establish its reasonable needs. From the time of the announcement in 1950 by Ford executives of Ford's plans to manufacture automatic transmissions on a large scale and install them in the automobiles produced by it, it was apparent to Tracy and the other directors of Alma that such action by Ford foreshadowed a decline in Ford's requirements for production clutches, of which Alma then and theretofore manufactured 50 per cent, except for low order jobs. Such action made it apparent that for each automobile manufactured with an automatic transmission there would be one less clutch which eventually might require reconditioning. The evidence shows that automobiles manufactured with automatic transmissions immediately became popular, not only with the purchasers of Ford automobiles but with the purchasers of automobiles manufactured by others. In 1951, approximately 23 percent of the automobiles manufactured by Ford were equipped with automatic transmissions. The number increased to approximately 39 percent in 1954, to approximately *197 55 percent in 1955, and to approximately 70 percent in 1957. In 1950, Alma sold a total of 2,889,000 clutches to Ford. The number declined to 1,729,000 in 1954 and continued to decline so that in 1958 only 1,407,000 were sold, or less than 50 per cent of the number sold in 1950, and approximately 82 percent of the number sold in 1954. From the foregoing it is apparent that during the period 1951 through 1958 Alma's business, from the standpoint of clutches manufactured and sold, experienced a drastic decline, a substantial part of which occurred during the years 1954 through 1958. It is true that although the number of clutches sold during the years in issue declined, the amount of Alma's sales stated in terms of dollars steadily increased from $6,877,000 in 1954 to $8,283,000 in 1958, and its net income after income tax increased from $441,833.41 in 1954 to $613,270.73 in 1958. The dollar increase in sales and in net income after taxes resulted from increases in sales prices approved by Ford primarily by reason of Alma's increased costs for labor, materials, and other items entering into the costs of production. From 1950 through the years in issue, Alma was faced with a situation *198 which not only presented no prospects for an increase in the number of clutches manufactured and sold to Ford, but definitely indicated a substantial decline with the possible eventual end of profitable operations. Following the decline in the number of cluthes sold after 1950, Alma engaged in an effort to locate and acquire some business or properties or both which would enable it to replace the decline in the number of its cluthes sold to Ford. In so doing Alma sought some business or properties connected with the metalworking business or that could be integrated with the metalworking business and preferably something connected with the metalworking business and preferably something connected with the automobile business. Such search was intensified in 1953, and so intensified, continued thereafter through the years in issue. Numerous businesses and properties were investigated and examined but for various reasons none were acquired. Information received from an inquiry Tracy made in the summer of 1956 of a Ford executive indicated that the Ford franchise for rebuilding engines and reconditioning other automobile parts and distributing them to Ford dealers in the states of California, *199 Utah, and parts of Arizona and Wyoming, and held by Meyer Welch, Los Angeles, California, was for sale. In 1957 and in 1958, negotiations were conducted for the acquisition by Alma of the Meyer Welch business and properties. Although at the end of 1958 the prospects appeared favorable for such acquisition, the negotiations terminated about March 1959 without such an acquisition being effectuated. In April 1959, Meyer Welch closed two of its branches and ceased service therefrom to Ford dealers. Later in that month, Ford requested that Meyer Welch resign its franchise. Following the request and the failure of Meyer Welch to comply therewith, Ford canceled the franchise. Subsequently and on June 1, 1959, Alma signed a franchise agreement with Ford granting to Alma the right to conduct the same type of operations and in the same territory as had been contained in the Meyer Welch franchise. Two months or more prior to June 1, 1959, Tracy, on the basis of his knowledge and experience obtained in the conduct of Alma's operations, and on the basis of firsthand information he had obtained as to conditions in Los Angeles, prepared and submitted to Alma's other directors a detailed estimate *200 of the financial outlay that would be required of Alma to assume the conduct of the operations carried on by Meyer Welch. The estimate related to manufacturing facilities, warehouses, equipment, inventory, and working capital requirements and totaled approximately $2,550,000. In its operations under the franchise of June 1, 1959, Alma by December 1959 had invested approximately $800,000 in machinery and inventories of automobile parts, and by December 1961 had made a total investment of $1,302,362, at which time Tracy estimated that a further outlay of $1,100,000 would be necessary. Respecting the justification for an accumulation of earnings and profits for reasonably anticipated future needs, the above-quoted regulations provide that there must be an indication that the future needs of the business require such accumulation and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Here, there was in each of the years in issue, a continuing and increasing need for Alma to acquire something to replace the business it had lost and would continue to lose from the continued decline in the number of clutches it was selling. Its plans for a *201 replacement were to acquire some business or properties connected with the metalworking business or that could be integrated with the metalworking business, and preferably something connected with the automobile business. Such were Alma's plans prior to and during the years in issue and thereafter until their consummation on June 1, 1959, when Alma acquired the Ford franchise on that date. In our view such plans were specific and definite and were clearly feasible as is established by their consummation in 1959. With an obvious continuing and steadily increasing need for a replacement throughout the years in issue, Alma did what it seems to us a prudent businessman would have done in Alma's situation - distribute to its stockholders a substantial portion of its earnings and profits each year and accumulate the remainder. In view of the foregoing, we have concluded and found as a fact that during the years in issue Alma did not accumulate earnings and profits beyond the reasonable needs of its business, including reasonably anticipated needs, and was not availed of for the purpose of avoiding the income tax with respect to its shareholders. Issue 2. Respondent's Determination That *202 Deductions Taken by Alma as Business Expenses Were Not Allowable. Opinion In determining the deficiencies in the income tax of Alma here in controversy, the respondent determined that deductions taken by Alma in the following amounts for the indicated years as business expenses incurred with respect to property at Harbor Point, Michigan, were not allowable: Year
Amount
1954
$13,980.56
1955
6,217.34
1956
7,529.47
1957
5,219.18
1958
5,641.01
In his opening statement at the hearing herein, counsel for the petitioners stated that no evidence would be offered on this issue. No evidence having been sumitted with respect to the issue and no mention thereof having been made on brief of petitioners, the determination of the respondent is sustained. Issue 4. Respondent's Determination That Part of the Expenditures Made by Alma With Respect to Property at Harbor Point, Michigan, Constituted Taxable Income of Petitioners Emmet E. Tracy and Frances A. Tracy. Opinion In determining the deficiencies in the income tax of petitioners Emmet E. Tracy and Frances A. Tracy here in controversy, the respondent determined that $2,050 of the amount of the expenditures *203 made by Alma with respect to property at Harbor Point, Michigan, for each of the years 1954 through 1958, constituted income of the petitioners for the respective years taxable as dividends. Since no evidence has been submitted with respect to the issue and no mention thereof has been made on brief of petitioners, we conclude that the petitioners have abandoned the issue and accordingly sustain the respondent's determination. Decisions will be entered under Rule 50. Footnotes
1. The amount of retained earnings remaining on December 31, 1959, after the payment by Alma in 1959 of a stock dividend of 39,523 1/2 shares with respect to which an amount of $3,939,523.50 was taken from retained earnings and added to Alma's capital account.↩
1. Includes cashier's check for $1,250,000 reported on balance sheet forming part of 1958 income tax return as customers' accounts receivable.↩
1. Exclusive of long-term capital gain from Schedule D.↩