ALMA PISTON COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RespondentAlma Piston Co. v. CommissionerDocket No. 5714-71.United States Tax CourtT.C. Memo 1976-107; 1976 Tax Ct. Memo LEXIS 295; 35 T.C.M. (CCH) 464; T.C.M. (RIA) 760107; April 6, 1976, Filed *295 1. Held, petitioner was availed of during each of the years 1967 through 1969 for the purpose of avoiding the income tax with respect to its share-holders; the accumulated earnings tax imposed by section 531 is therefore applicable to the corporation's accumulated taxable income for each of such years. 2. Held, compensation paid to petitioner's president in excess of $ 150,000 in each of the years 1967 through 1969 was unreasonable and not deductible by the corporation under section 162. 3. Held, the fair market value of property donated by petitioner to the Salvation Army in January 1967 was $ 30,760. Paul R. Trigg, Jr., for the petitioner. Chauncey W. Tuttle, Jr., for the respondent. IRWINIRWIN, Judge: Respondent determined deficiencies in petitioner's income tax for the years 1967, 1968 and 1969 in the following amounts: 19671$ 676,593.84 1968692,424.061969604,736.99The issues presented for our decision are: (1) whether during 1967, 1968 and 1969 petitioner was availed of for the *296 purpose of avoiding income tax on its shareholders by permitting its earnings and profits to accumulate instead of being distributed; (2) whether the amount of compensation paid to petitioner's president during the years 1967, 1968 and 1969 was unreasonable within the meaning of section 162; 2 and (3) the fair market value of property contributed to the Salvation Army by petitioner in 1967. GENERAL FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Alma Piston Company (hereinafter referred to as Alma Piston or petitioner) is a corporation organized and existing under the laws of the State of Michigan. For the years 1967, 1968 and 1969 petitioner, an accrual basis taxpayer, timely filed Federal income tax returns with the district director of internal revenue in Detroit, Mich.Petitioner was incorporated in 1946 and succeeded to the business and assets of a pre-existing partnership doing business under the same name. On incorporation 50 percent of petitioner's stock was owned by Emmet E. Tracy (hereafter Tracy) and members of his family (some of which *297 was in trust for their benefit). The remaining 50 percent of petitioner's stock was owned by Katherine T. Rolley (hereafter Rolley). In August 1946 petitioner redeemed approximately two-thirds of the stock held by Rolley, leaving her with approximately 25 percent of petitioner's stock. In August 1948 the balance of Rolley's stock was redeemed. Since that time all of petitioner's issued and outstanding stock has been owned by Tracy, members of his family and by trusts established for the benefit of various members of the Tracy family. From January 1, 1967, to December 24, 1969, the stock of petitioner was owned as follows: Percent ofShareholderStockEmmet E. Tracy4Frances A. Tracy (wife of Emmet E. Tracy)50Paul R. Trigg, Emmet E. Tracy, Jr.,Trustees for the benefit of Emmet E.Tracy, Jr. (son of Emmet E. Tracy)11.5Paul R. Trigg, Emmet E. Tracy and MaryTracy Farley, Trustees for the benefitof Mary Tracy Farley (daughter of EmmetE. Tracy)11.5Paul R. Trigg, Emmet E. Tracy and ThomasJ. Tracy, Trustees for the benefit ofThomas J. Tracy (son of Emmet E. Tracy)11.5Frances A. Tracy, Trustee for the benefitof Denise A. Tracy (daughter of EmmetE. Tracy)11.5100.0On December 24, 1969, Tracy made *298 gifts of.4 of one percent of petitioner's outstanding stock to trusts established for the benefit of his seven grandchildren, leaving him with 3.6 percent of the stock. The other stockholdings in petitioner remained unchanged during this period. Since its incorporation, Tracy has acted as president, chief executive officer and general manager of petitioner. Throughout the years 1967 to 1969, inclusive, petitioner's board of directors consisted of Emmet E. Tracy, Frances A. Tracy, Emmet E. Tracy, Jr., and Paul R. Trigg, Jr.From 1959 to September 1968 petitioner had three divisions: the Alma Products division (Alma Products); the Genuine Parts Distributors Midwest division (GPD Midwest); and the Genuine Parts Distributors West Coast divison (GPD West Coast). Alma Products manufactures new clutches for incorporation in motor vehicles and it also reconditions used clutches. GPD Midwest remanufactures 3*299 various auto parts. GPD West Coast is a distributor to Ford dealers of rebuilt or reconditioned auto parts. In September 1968 petitioner purchased the assets of the Thomas Engine Company of City of Industry, Calif., for a cash payment which, together with additional sums invested in the business prior to the end of the year, aggregated $ 1,000,000. This company was a remanufacturer of engines, crankshafts and camshafts with sales throughout the western states and Hawaii. The assets of Thomas Engine Company were contributed to the Upshur Engine Company, Inc.--a wholly-owned subsidiary of petitioner. In December 1969 the Upshur Engine Company, Inc., became a division of petitioner known as the Tomadur Engine division. Alma Products deals primarily with Ford Motor Company. From prior to 1959 until 1967 Alma Products supplied Ford with 50 percent of Ford's requirements for production clutches, which are new clutches for incorporation in motor vehicles manufactured by Ford. From 1967 through 1969 Alma Products supplied Ford with 25 percent of its requirements for production clutches. Ford purchased the remaining part of its requirements from Borg-Warner Corporation. Borg-Warner *300 designed all clutches used by Ford, including those manufactured by Alma Products. Ford pays a higher price for clutches purchased from Borg-Warner because of the engineering and design work completed by that company. Since before 1960 Alma Products has supplied Ford with 100 percent of its requirements for reconditioned clutches. Issue 1: Accumulated Earnings TaxThe price for a newly engineered clutch is usually established according to the following procedure. Ford first requests petitioner to submit a bid on the business. Petitioner then communicates to Ford's purchasing department a unit price for the item. Ford's purchasing department, using a target price established by the company's price analysis section, begins negotiations with petitioner for a final price. In the meantime Ford issues a purchase order to petitioner without specifying a price. The purchase order carries the legend: "price to be agreed upon before billing." Once petitioner receives a purchase order it is expected to commence manufacture and shipment of the product at the time specified in the purchase order even though the price has not been established. Petitioner does not bill Ford for parts, even though *301 manufactured and shipped, until a price has been set. Consequently, there can be considerable delay between the time petitioner ships parts to Ford and when petitioner receives payment. While it would be theoretically possible for petitioner to obtain a temporary price during the period of price negotiation, enabling petitioner to receive at least partial payment, petitioner's president believed that an agreement as to a temporary or tentative price would adversely affect petitioner's negotiating position as to a final price. No large supplier of Ford follows the practice of requesting temporary prices. In 1964 petitioner experienced a particularly difficult price negotiation with Ford with respect to new model clutches, resulting in significant delays in payment for clutches manufactured by petitioner and shipped to Ford. The following chart illustrates the extent of the 1964 payment holdup: PurchaseNo. ofOrderDate ofShipmentsPricePaymentdaysNumberIssueCommencedApprovedMadeElapsedFE 2764034-27-646-24-641-1-652-20-65249FE 2888576-2-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-1-641-15-65182FE 2888566-12-647-9-641-6-652-20-65208FE 2888595-29-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-1-641-18-65186FE 2764024-27-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-24-6412-15-64211FE 2890206-24-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-6-6412-20-64135FE 2892678-4-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-18-6412-20-64106FE 2888586-2-648-14-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-15-64115FE 2765972-14-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-1-641-20-65291FE 2766823-26-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-8-6411-15-64196FE 1512hj6-24-647-1-641-15-652-20-65205FE 2894118-3-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-1-641-20-65120FE 2892597-3-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-18-6412-20-64138FE 2766843-26-646-22-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-10-64180*302 As a result of this particular payment holdup, petitioner's outstanding tentative billings 4 to Ford rose from $ 20,131, as of May 31, 1964, to $ 2,178,550 as of October 31, 1964, and $ 2,620,388 as of November 30, 1964. When petitioner wishes to increase its price on a production clutch or a reconditioned clutch (as opposed to establishing a price for a newly engineered clutch), there is a similar procedure for negotiating the amount of the increase. After petitioner notifies Ford of the proposed increase, Ford's price analysis section establishes a target price which is used by Ford's purchasing department as a guideline in its negotiations with petitioner. Although petitioner could bill Ford at the old price for clutches shipped during the period in which negotiations for a price increase are underway, it does not do so. Rather, petitioner withholds billing until *303 a new price is agreed upon, at which time it bills Ford for all clutches shipped from the time the increase was requested. This results in an effective date for the price increase which corresponds with the date the increase was first requested. During its early years petitioner experienced some difficulty in establishing an effective date for price increases. The policy of not billing for parts shipped until an increase is agreed upon was established in order to overcome that difficulty. This practice is followed by most, if not all, of Ford's major suppliers. During 1968 petitioner experienced significant delays in payment for both production clutches and reconditioned clutches shipped to Ford during price increase negotiations. By letter dated March 26, 1968, petitioner notified Ford of proposed increases in prices for production clutches. On April 16th, petitioner's president hand carried a letter to Ford's purchasing agent which detailed the proposed increases. Tracy was informed, however, that the primary supplier, Borg-Warner, had also submitted proposed increases which had not yet been agreed to. Since Tracy believed that no action would be taken upon petitioner's requested *304 increases until an agreement had been established with the primary supplier, he did not submit his proposals to Ford's purchasing agent at that time. In fact, the specific price increases were not submitted to Ford until August 28, 1968. An agreement as to the price increases for production clutches was reached on October 11, 1968. During the period from April 1, 1968, to mid-October 1968, petitioner did not bill Ford for production clutches shipped to Ford for which price increases were pending. By letter dated April 18, 1968, petitioner notified Ford that it would also request price increases for reconditioned clutches, but the letter further indicated that petitioner would not be able to specify the proposed increases until an agreement had been reached on the price increases for production clutches. Immediately after the increases for production clutches had been agreed to, in October 1968, petitioner informed Ford of the specific increases requested for reconditioned clutches. An agreement as to the increases for reconditioned clutches was reached on February 5, 1969. According to its regular practice, petitioner withheld billing for reconditioned clutches shipped to Ford from *305 April 1, 1968, until the increases were agreed upon in February 1969. Petitioner's GPD West Coast division is a distributor to Ford dealers of rebuilt auto parts. When this division was established in 1959, Tracy prepared an estimate of the total investment which petitioner would have to make with respect to this division. The estimate included, among others, the following items (referred to hereafter as West Coast Expansion Plans): ProjectedItemCost1. Engine manufacturing plant$ 210,0002. Equipment for engine plant350,0003. Initial inventory of engine cores90,0004. Inventory of component parts forengine plant100,0005. Accounts receivable increaseattributable to engine business60,0006. Salt Lake City warehouse70,0007. Phoenix warehouse40,000Total$ 920,000Although petitioner did make some of the investments contemplated in Tracy's 1959 estimate, 5*306 nothing had been invested by the end of 1969 with respect to the above items. Rather than completing these expansion plans during these years, petitioner rented warehouses in Salt Lake City (6,000 square feet) and Phoenix (5,000 square feet) and bought rebuilt engines from other companies. Minutes of meetings held by petitioner's board of directors during the years 1959 through 1969 contain no reference to these plans. Tracy, as petitioner's president, did briefly allude to these proposed investments in annual reports submitted by him to the board of directors. Tracy's annual reports for the years 1963 through 1969 estimated the total costs associated with the West Coast Expansion Plans as follows: ProjectedYearCosts1963$ 950,00019641,087,00019651,200,00019661,200,0001967Noestimate19681,315,00019691,250,000Although Tracy's annual report for 1967 did not include an estimate respecting the costs involved in completing these plans, Tracy did prepare such an estimate during 1967. The estimate prepared in 1967 totaled $ 1,565,000 and included the following projected costs: Salt Lake City warehouse (20,000 square feet)$ 195,000Phoenix warehouse (20,000 square feet)210,000Engine rebuilding plant (70,000 square feet)560,000Engine rebuilding equipment350,000Initial engine core inventory90,000Initial engine component parts inventory100,000Investment required to carry engine accountsreceivable of engine rebuilding plant60,000Total$ 1,565,000In *307 1959 petitioner submitted to Ford floor plans of petitioner's proposed engine plant. No such plans regarding the engine plant or any of the other buildings in petitioner's expansion program were produced at trial. At the time of trial neither the engine plant nor the Salt Lake City warehouse had been constructed. Construction of a 10,000 square foot warehouse in Phoenix began in 1969 and was completed in 1970 at a cost of $ 140,000. Petitioner maintains that it was entitled to withhold earnings in the years 1967, 1968 and 1969 in order to meet the costs of the West Coast Expansion Plans in the following amounts: 1967$ 1,565,000196861,565,000 19697*308 1,500,000 In 1968 petitioner secured a contract from General Motors to remanufacture transmission converters. The record is not clear as to whether this work was to be done by petitioner's Alma Products division or by its GPD Midwest division. During 1968 petitioner spent approximately $ 286,000 on plant expansion for the purpose of being able to meet General Motors' needs for transmission converters. In his 1968 report to the board of directors, Tracy estimated that petitioner would need to spend the following additional amounts in order to complete the contemplated expansion under this program: Modernization of building$ 100,000Construction of warehouse256,000Equipment and storage racks for warehouse50,000Three diesel tractors and three trailersto transport converters to GeneralMotors' depots60,000$ 466,000The warehouse was constructed in 1969 at a cost of $ 272,000. At the time of trial petitioner had not yet acquired the transportation *309 equipment and was shipping the transmission converters by common carrier. Petitioner did not intend to purchase the transportation equipment until sales of transmission converters tripled. We have no evidence that petitioner ever completed the modernization of its building which was referred to in Tracy's 1968 report. Petitioner maintains that it was entitled to retain earnings in order to meet its expansion plans with respect to the transmission converter program in the following amounts: 19688$ 405,000 1969960,000 In 1967 petitioner began an extensive modernization program with respect to its Alma Products division. This program was initiated in response to a similar program undertaken by Borg-Warner, petitioner's competitor in the production of new clutches. Tracy reported to petitioner's board of directors at the end of 1967 that new machinery had been ordered which would be delivered in 1968 at a total cost of $ 400,000. *310 At the end of 1968 Tracy informed the board of directors that an additional $ 225,000 would be required to complete the modernization program. Petitioner spent the following amounts in respect of this program during the years in issue: 1967$ 244,0001968342,0001969152,000Petitioner maintains that it was entitled to retain earnings in order to meet the projected costs of this modernization program in the following amounts: 1967$ 400,0001968225,00019691073,000 In December 1968 Tracy estimated that modernization of the engine rebuilding plant used by petitioner's subsidiary, Upshur (which became the Tomadur Engine division in December 1969), plus the amount necessary to finance its accounts receivable would involve a total investment of *311 $ 420,000. Additionally, Tracy estimated in December 1968 that petitioner would eventually need to invest an additional $ 620,000 in constructing a new building for this operation. During 1969 petitioner spent between $ 400,000 and $ 500,000 for plant improvements and for the financing of accounts receivable with respect to this operation. Although Tracy again estimated, in December 1969, that petitioner would need to invest $ 620,000 in the construction of a new building, petitioner had not yet begun any such construction at the time of trial. Petitioner maintains that it was entitled to retain earnings in order to meet its projected needs with respect to the Tomadur division in the following amounts: 1968$ 1,040,0001969620,000Respondent has asserted an accumulated earnings tax against petitioner for each of its taxable years from 1954 through 1966. For the years 1954 through 1958 the total accumulated earnings tax asserted against petitioner was $ 755,167.95. Petitioner filed a petition with this Court with respect to those years and we held that the accumulated earnings tax was not applicable. 11 For the years 1959 through 1963 respondent determined deficiencies against petitioner *312 totaling $ 1,749,529.28, of which $ 1,438,414.44 was a tax on accumulated earnings. In 1965 petitioner paid $ 300,000 in settlement of the deficiencies asserted for the years 1959 through 1963. In 1967 respondent commenced a field audit of petitioner's income tax returns for the years 1964, 1965 and 1966. During 1967 the field agent conducting the audit informed petitioner that he proposed to assert tax deficiencies for each of the years under audit, and on December 20, 1967, petitioner received notice pursuant to section 534(b) of a proposed notice of deficiency for such years which included an amount with respect to the accumulated earnings tax. In a report to petitioner's board of directors on December 11, 1967, Tracy indicated that proposed deficiencies for 1964, 1965 and 1966 totaling $ 1,900,000 plus interest should not be disregarded in determining petitioner's cash needs. On March 7, 1968, respondent issued a notice of deficiency covering the years 1964, 1965 and 1966 asserting a total deficiency of $ 1,942,071.09, of which $ 1,682,508.07 was a tax on accumulated earnings. Tracy advised petitioner's board of directors at the end of 1968 and 1969 that the asserted deficiencies *313 for 1964, 1965 and 1966 were still pending and should be given consideration in determining petitioner's need for cash. In 1970 petitioner paid $ 500,000 in settlement of the deficiencies asserted for the years 1964 through 1966. The record of dividends paid by petitioner for the years 1947 through 1969 is as follows: Payment DateAmountPayment DateAmount12-30-47$ 100,000.0012-24-58$ 100,000.0012-30-48100,000.0012-15-59100,000.0012-30-49110,071.5012-9-60100,00 0.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,000.0012-12-61100,000.0012-15-5050,000.0012-6-62100,000.0012-25-51100,000.0012-5-6310 ,0000.0012-15-52100,000.0012-3-64100,000.0012-22-53100,000.0012-5-65100,000.0012-26-54100,000.0012-9- 66100,000.0012-26-55100,000.0012-11-67100,000.0012-26-56100,000.0012-16-68100,000.0012-10-57100,000.0012-15-6954,000.0012-30-6946,000.00 Petitioner's accumulated earnings and profits and the increase in earnings and profits over prior years during the years in issue were as follows: AccumulatedIncrease overDateEarnings and ProfitsPrior YearsDecember 31, 1966$ 11,682,806December 31, 196713,002,887$ 1,320,081December 31, 196814,203,4461,200,559December 31, 196914,851,710648,264 Petitioner's net *314 liquid assets for each of the years in issue were as follows: Current Assets196719681969Cash$ 1,556,685$ 3,968,13112$ 3,125,842 Certificates of Deposit5,800,0004,000,000Accounts Receivable2,052,1045,527,6832,384,727Inventory2,538,9472,616,6843,684,601Container Deposits11,60711,51414,488Prepaid Expenses123,131136,025426,038Accrued Interest Receivable57,056Total current assets$ 12,082,474$ 12,260,037$ 13,692,752Current LiabilitiesAccounts payable$ 831,378$ 1,109,668$ 1,393,262Customer Deposits99,979117,599263,417Payroll deductions15,50523,46468,088Management Services283,416307,907262,286Payroll16,97235,84427,218Payroll taxes9,07210,95920,105Other taxes91,374135,30513118,641 Federal income tax116,026118,920Total current liabilities$ 1,463,722$ 1,859,666$ 2,153,017Net liquid assets$ 10,618,752$ 10,400,371$ 11,539,735On March 12, 1972, notification was sent by certified mail to petitioner, pursuant to section 534(b), informing *315 petitioner of a proposed notice of deficiency for the taxable years 1967, 1968 and 1969, wherein there was included an amount with respect to the accumulated earnings tax imposed by section 531. Petitioner made no statement in response to that notification as is permitted under the provisions of section 534(c). Issue 2: President's CompensationPetitioner was incorporated in 1946 as the successor to a partnership which had been formed in 1943. Tracy was general manager of the partnership and he and members of his family had a 25 percent ownership interest in the partnership. As general manager of the partnership, Tracy was compensated at the rate of $ 9,000 per year plus 10 percent of the profits. Upon incorporation Tracy was made president of the corporation. His salary for 1946 was set at 25 percent of petitioner's net profits before taxes but was limited to $ 34,000. On March 18, 1947, petitioner's board of directors determined that Tracy's salary for 1947 should be $ 9,000 plus 10 percent of petitioner's net profit before taxes. At the time this decision was made, Tracy and members of his family owned 75 percent of petitioner's stock. The board of directors at that time consisted *316 of Tracy, his wife, Paul Trigg (petitioner's attorney), Katherine Rolley (unrelated to Tracy), and Elmer Rolley (unrelated to Tracy). Tracy's salary was determined according to this formula in each of the years 1947 through 1969. In addition to his salary, Tracy received profit sharing benefits. During the years in issue, Tracy served as president, chief executive officer, treasurer and chief financial officer of petitioner. Petitioner's gross sales, net profits (before president's compensation), the president's compensation (exclusive of profit sharing benefits), net profits (after president's compensation and Federal income tax), and the dividends paid by the petitioner were as follows: Net ProfitsNet ProfitsBeforeAfterPresident'sPresident'sCompensa-Presi-Compensa-tion anddent'stion andFederalCompen-FederalYearGross SalesIncome TaxsationIncome TaxDividends1947$ 3,711,060$ 448,185$ 53,472$ 248,185$ 100,00019484,989,000938,000102,826523,647100,00019495,600,000996,000108,602555,833110,07119507,357,0001,327,000140,843632,447100,00019516,546,000922,000101,277414,785100,00019527,384,000889 ,00097,097386,159100,00019536,539,000904,00099,417396,870100,00019547,624,0001,019,000110,0004 41,833100,00019558,153,0001,214,000129,518526,153100,00019568,092,000956,000103,336413,044100,00 019578,349,0001,371,000145,281595,938100,00019587,403,0001,415,000149,623613,270100,00019599,55 4,0001,604,000172,844495,211100,000196011,710,0001,714,000179,578742,566100,000196111,164,0001,3 89,000147,019600,785100,000196212,809,0001,836,000191,753804,412100,000196314,117,0002,335,00024 1,5161,018,563100,000196416,063,4962,818,610289,2611,280,888100,000196517,194,5823,234,141331,5141,535,349100,000196617,796,8303,129,615321,0611,487,276100,000196715,533,3012,753,157283,4151,314 ,216100,000196816,416,3662,998,068307,9061,314,941100,000196919,537,6582,245,762262,285892,839100,000*317 In addition to the compensation listed above, Tracy received benefits from a profit sharing plan as follows: 1967$ 46,085196840,588196943,780The following table sets forth the amounts of compensation 14 received by petitioner's next six highest paid employees during the years in issue: RobertJamesVincentH. N.LoweHicksDivisionSimonsPhilD. S.MillikinCalendarDivisionManagerProductionGoodrichTildenAssistantYearManagerWestManagerComptrollerSuperintendentComptrollerCoast1967$ 44,500$ 32,600$ 27,060$ 26,060$ 17,660196847,00034,25729,06028,06017,660196947,00035,01429,06028,060$ 18,170Issue 3: Charitable Contribution DeductionOn January 18, 1967, petitioner contributed to the Salvation Army, Men's Social Service Center in Detroit, Mich., certain personal property consisting of manufacturing machines. The Salvation Army is an organization described in section 170(c)(2). In November 1966 petitioner employed Manufacturers Appraisal Company (hereinafter Manufacturers) to inspect and appraise the machinery which petitioner intended to donate to the Salvation Army. Manufacturers' representative, *318 Hugh Courtemanche (hereafter Courtemanche), inspected the machinery in November 1966. As he inspected each item, Courtemanche made notes indicating the type of machine, model number and serial number. Although Courtemanche inspected 30 different items of machinery, his notes reflect the actual physical condition of only three of the items. Courtemanche's notes were sent to Manufacturers' office in Philadelphia, where another individual made a determination as to the fair market value of each item of machinery inspected by Courtemanche. This determination was made by computing a cost of reproduction for each item and applying a reduction factor which took into account the machine's age, condition and current market demand. After this determination had been made, Manufacturers advised petitioner that the fair market value of the machinery inspected by Courtemanche was $ 121,049. 15*319 In January 1967 the donated machinery was sold by the Salvation Army in bulk for $ 3,500 to Charles Kinsey, a dealer in machinery, who purchased the machinery in a joint venture with Charles Lynch for the purpose of storing it and reselling it. At the time of trial some of the items had been sold, some had been scrapped and the remaining items were still being held by Lynch and Kinsey for possible sale. The following chart sets forth for each of the items donated by petitioner: the year acquired by petitioner; cost of the item; undepreciated cost; Manufacturers' appraisal of value in November 1966; and the price at which the item was sold by Lynch or, in the case of an item not yet sold, Lynch's estimate of the item's value in January 1967. DepreciationYearthroughDescriptionAcquiredCost12-31-661. Bullard drill1957$ 1,429.66$ 949.852. Van Norman grinder196114,672.057,975.423. Van Norman grinder196115,610.058,485.304. Sundstrand lathe19474,534.254,534.255. Sundstrand lathe194616,063.5914,628.756. Sundstrand lathe194616,072.1114,617.327. Sundstrand lathe1958885.06885.068. Sundstrand lathe1947715.00715.009. Sundstrand lathe1958885.06885.0610. Heald grinder19581,475.101,475.1011. Snyder drill1958590.04590.0412. Barber grinder1958200.00199.4113. Gisholt balancer1957178.29118.4614. Gisholt balancer1958118.01118.0115. Gisholt balancer1958118.01118.0116. Sibley drill195870.8070.8017. Leland drill195847.2047.2018. Mallory cleaningunit1950641.00641.0019. Detroit screwdriver1958118.01118.0120. Krueger timingmarker195888.5188.5121. National gear19shaver 22. Detroit drill1958354.02354.0223. Grant spinner195075.0075.0024. Cincinnati drill195859.0059.0025. Krueger drill19536,913.036,913.0326. Avey drill1958177.01177.0127. Avey drill1958177.01177.0128. Heald grinder1958413.03413.0329. Disc balancer195810.6210.62TOTAL:$ 82,690.52$ 65,439.28*320 Value asSales Price orUndepre-Appraised byLynch's OpinionciatedManufacturersof Value orDescriptionCostin Nov. 1966Whether Scrapped1. Bullard drill$ 479.81$ 23,44016$ 300 to $ 400 2. Van Norman grinder6,696.6313,76016$ 4,500 3. Van Norman grinder7,124.7513,760$ 500 to $ 10,00017*321 4. Sundstrand lathe5,62516$ 2,000 5. Sundstrand lathe1,434.846,47516$ 3,250 6. Sundstrand lathe1,454.796,47516$ 3,250 7. Sundstrand lathe4,97016$ 2,460 8. Sundstrand lathe4,97016$ 1,400 9. Sundstrand lathe4,97016$ 1,400 10. Heald grinder9,2701811. Snyder drill17,0101712. Barber grinder.593,225No sale; no opinion13. Gisholt balancer59.831,3351814. Gisholt balancer1,3351815. Gisholt balancer6541816. Sibley drill151817. Leland drill30017$ 200 18. Mallory cleaningunit300No sale: no opinion19. Detroit screwdriver17$ 500 20. Krueger timingmarker75No sale; no opinion21. National gear19shaver 45016$ 400 22. Detroit drill601823. Grant spinner4001824. Cincinnati drill3001825. Krueger drill55017$ 1,000 26. Avey drill3001827. Avey drill3001828. Heald grinder3501829. Disc balancer18TOTAL:$ 17,251.24$ 120,674$ 21,160 (using lowfigures)$ 30,760 (using highfigures)OPINION Issue 1: Accumulated Earnings TaxThe first issue is whether petitioner was availed of during each of the years in issue for the purpose of avoiding the income tax with respect to its shareholders, by permitting its earnings and profits to accumulate instead of being divided or distributed. Under section 533 the fact that earnings and profits have been accumulated beyond the reasonable needs of the business is determinative of the proscribed purpose unless the corporation proves to the contrary by a preponderance of the evidence. Since petitioner has not availed itself of the opportunity to shift the burden of proof to respondent, under section 534, respondent's determination that petitioner's earnings and profits have in fact been accumulated beyond the reasonable needs of the business is presumptively correct. See Novelart Manufacturing Co.,52 T.C. 794 (1969), affd. 434 F. 2d 1011 (6th Cir. 1970), cert. denied 403 U.S. 918 (1971). Petitioner maintains that its earnings *322 and profits were not accumulated beyond the reasonable needs of its business and claims that those needs included: (1) normal working capital; (2) additional working capital needed in order to meet the expenses of its Alma Products division during payment holdups by Ford; (3) proposed expansion and modernization; and (4) pending tax deficiencies and interest asserted for prior years. A determination of petitioner's reasonable business needs is important in two respects. First, as already mentioned, to the extent earnings and profits have been accumulated beyond the reasonable needs of petitioner's business, the prohibited purpose of tax avoidance is presumed. Section 533. Secondly, in computing "accumulated taxable income," the base against which the tax is applied, there is a credit for the earnings and profits of the current year which are retained to meet petitioner's reasonable business needs. Section 535(c). In evaluating petitioner's alleged needs, we recognize that we are making an essentially factual determination. Estate of Goodall v. Commissioner,391 F. 2d 775, 796 (8th Cir. 1968), modifying a Memorandum Opinion of this Court, cert. denied 393 U.S. 829 (1968); Golconda Mining Corp.,58 T.C. 139, 160 (1972), *323 reversed on another issue 507 F. 2d 594 (9th Cir. 1974); Faber Cement Block Co.,50 T.C. 317, 327 (1968); Bremerton Sun Publishing Co.,44 T.C. 566, 582 (1965), appeal dismissed (9th Cir. 1966). We also recognize that, in the first instance, it is the responsibility of the corporate officers and directors to determine the reasonable needs of a particular business. We are consequently reluctant to substitute our judgment for that of corporate management unless we are compelled to do so by the relevant facts and circumstances. Faber Cement Block Co.,supra at 329; Bremerton Sun Publishing Co.,supra at 583; F. E. Watkins Motor Co.,31 T.C. 288, 300 (1958). Once we have determined the amount of petitioner's reasonable needs for each of the years in issue, we must decide whether petitioner's earnings and profits were permitted to accumulate beyond those needs. We do not, however, merely compare the total amount needed in the business with petitioner's total accumulated earnings and profits. Rather, we look to the accumulated earnings and profits which were reflected in petitioner's net liquid assets. Ivan Allen Co. v. United States,422 U.S. 617 (1975), affg. 493 F. 2d 426 (5th Cir. 1974); *324 Smoot Sand & Gravel Corporation v. Commissioner,274 F. 2d 495 (4th Cir. 1960), cert. denied 362 U.S. 976 (1960), affg. a Memorandum Opinion of this Court; Montgomery Co.,54 T.C. 986, 1008 (1970); Novelart Manufacturing Co.,supra at 806; Faber Cement Block Co.,supra at 328; John P. Scripps Newspapers,44 T.C. 453, 467 (1965). As the Supreme Court stated in its recent opinion in Ivan Allen Co.,supra at 628, "The question, therefore, is not how much capital of all sorts, but how much in the way of quick or liquid assets, it is reasonable to keep on hand for the business." This is consistent with our view as stated in Faber,supra at 328, that "it is the nature of the assets to which the accumulated earnings and profits are committed, rather than the mere monetary size of such accumulations, which controls." With these principles in mind, we turn to an evaluation of petitioner's alleged business needs. A. Normal Working CapitalRespondent's regulations indicate that working capital is a reasonable need of the business. Section 1.537-2(b)(4), Income Tax Regs. The parties agree that petitioner's need for working capital was equal to that amount which would be sufficient to meet its *325 operating expenses for one complete operating cycle. Generally, this amount is arrived at by determining the length of the operating cycle as a percentage of one year and by multiplying the total operating costs for one year by that percentage. Ready Paving & Construction Co.,61 T.C. 826 (1974); Magic Mart, Inc.,51 T.C. 775 (1969); Faber Cement Block Co.,supra.An operating cycle is the period of time it takes to convert cash into raw materials, raw materials into inventory, inventory into sales and the time it takes to collect for the sales. 20 Thus, an operating cycle consists of at least two separate component cycles: (1) an inventory cycle; and (2) an accounts receivable cycle. The length of the inventory cycle can be determined by dividing the number of days in one year by the number of times inventory turns over during one year. Inventory turnover can be determined by dividing the cost of goods sold for one year by either average monthly inventory or peak monthly inventory. Similarly, the length of the accounts receivable cycle can be determined by dividing the number of days in one year by the number of times accounts receivable turn over during one year. The turnover rate *326 of accounts receivable can be determined by dividing yearly sales by either average monthly accounts receivable or peak monthly accounts receivable. Use of average or peak figures, in computing the turnover of inventory or accounts receivable, depends upon whether it is relevant to know the average or the peak duration of an operating cycle. Although both parties profess to have computed petitioner's working capital needs according to the so-called Bardahl formula, they have reached very different conclusions. Their principal differences arise in computing the length of the operating cycle. While respondent would allow petitioner to retain enough liquid assets to pay expenses incurred during an average 21 operating cycle, petitioner argues that it was justified in retaining liquid assets in an amount necessary to meet expenses during a peak 22*328 operating cycle. Respondent further argues that the length of the operating cycle should be reduced by the average period of time during which petitioner was able to defer payment for materials purchased through the use of credit. Respondent would accordingly have us use a third cycle--the credit *327 cycle--in computing the length of petitioner's operating cycle. In respondent's view the number of days in the credit cycle should be subtracted from the total number of days in the inventory and accounts receivable cycles. Respondent computes the length of the credit cycle by dividing the number of days in one year by the number of times that trade payables turnover during one year. The turnover of trade payables is determined by dividing the total for materials purchased during the year by average monthly trade payables. We agree with petitioner that peak rather than average inventory and accounts receivable should be used in computing the length of its operating cycle. Magic Mart, Inc.,supra;23*329 but see Faber Cement Block Co.,supra at 331. Respondent's regulations indicate that a corporation's reasonable business needs are determined according to what a prudent businessman would consider appropriate. Section 1.537-1(a), Income Tax Regs. Clearly there were instances during each year when petitioner's cash was committed to inventory and receivables for a substantially longer period than would normally be the case. Where experience has shown that there are times during the year when a corporation is required to build up its inventory or carry accounts receivable beyond the normal collection period, we believe prudent business judgment would call for the retention of cash or other liquid assets in an amount necessary to meet the corporation's expenses during these peak periods. We agree with respondent, however, that petitioner's use of credit in purchasing materials is one of the factors which should be considered in computing its need for working capital. As was said in Smoot Sand & Gravel Corp. v. Commissioner,241 F. 2d 197 (4th Cir. 1957), modifying *330 a Memorandum Opinion of this Court, cert. denied 354 U.S. 922 (1957), at 207: Working capital needs of business vary, being dependent upon the nature of the business, its credit policies, the amounts of inventories and rate of turnover, the amount of accounts receivable and the collection rate thereof, the availability of credit to the business, and similar relevant factors. [Emphasis supplied.] The decision in Smoot Sand & Gravel Corp.,supra, was prior to our decision in Bardahl and, therefore, considered working capital needs for one full year, under the rule of J. L. Goodman Furniture Co.,11 T.C. 530 (1948). The factors considered in Smoot Sand & Gravel Corp.,supra, however, are as relevant in determining working capital needs for a single operating cycle as they were under the old one year rule. The computational objective of the Bardahl formula is to determine the amount of cash needed to meet expenses during an operating cycle. To the extent a corporation may defer payment of expenses, through the use of credit, its need for cash is diminished. We have previously treated the availability of credit as a relevant factor in determining working capital requirements, Ready Paving & Construction Co.,supra, *331 24 and we are convinced that we should do so here. We have accordingly determined petitioner's working capital requirements for each of the years in question as follows: 196719681969251. Peak inventory $ 2,522,351$ 2,874,622$ 2,723,5752. Cost of goods sold (less depreciation)11,330,54012,100,38815,003,89826*333 3. Inventory Turnover (line 2 / line 1)4.5 times4.2 times5.5 times4. Inventory cycle in days (days in year/line 3)81.1 days87.1 days66.4 days255. Peak accounts receivable 2,566,7505,947,4966,542,705276. Net sales 15,481,19216,354,77919,272,2247. Accounts receivable turnover(line 6 / line 5)6.0 times2.7 times2.9 times8. Accounts receivable cycle in days(days in year / line 760.8 days135.6 days125.9 days9. Average trade payables854,571965,2571,116,15510. Materials Purchased8,524,8289,039,77310,860,47311. Trade payables turnover (line 10 /10 times9.4 times9.7 timesline 9)12. Credit cycle in days (days in year /line 11)36.5 days38.9 days37.6 days13. Total operating cycle in days(line 4 + line 8 - line 12)105.4 days183.8 days154.7 days14. Operating cycle as percent of year(line 13 / days in year)29%50%42%15. Cost of goods sold (as above)11,330,54012,100,38815,003,8982816. Other operating expenses 1,865,3661,839,5722,384,87517. Total operating expenses (line 15 +13,195, 0613, 39,96017,388,773line 16)18. Current operating needs (line 17 X3,826,8126,969,9807,303,285line 14)*332 B. Additional Working CapitalThrough the years there have been periods of time when parts manufactured or reconditioned by petitioner's Alma Products division were being shipped to Ford, but during which petitioner was not receiving payment from Ford. These payment *334 holdups resulted from petitioner's practice of not billing for parts shipped until either an initial price for newly designed parts or an increase in price on older model parts had been agreed upon. Petitioner maintains that, at the end of each of the years here in question, it was required by prudent business judgment to take into account the probable effect on its cash position of a payment holdup in the following year. As for 1967, petitioner maintains that it was entitled to take into account a possible payment holdup equal in duration to the holdup experienced in 1964. As for 1968 and 1969 petitioner maintains that it was entitled to take into account possible payment holdups equal in duration to the one experienced in 1968. Petitioner calculates the amount of cash it was entitled to retain in order to meet the expenses of its Alma Products division during payment holdups as follows: 196719681969Duration of prior or cur-rent payment holdup197 days311 days311 daysSafety margin30 days30 days30 daysTotal anticipated holdupperiod227 days341 days341 daysTotal anticipated holdupperiod (in percent ofyear)62.2%93.4%93.4%Cost of goods sold--AlmaProducts division(less depreciation)$ 6,746,949$ 6,355,412$ 7,469,533Other operating expenses--Alma Products divi-sion (less depreciation)854,908831,331852,676Total expenses--AlmaProducts division$ 7,601,857$ 7,186,743$ 8,322,209Reserve for expenses ofAlma Products divisionduring holdup period(total expenses timesholdup period)$ 4,728,355$ 6,712,417$ 7,772,943*335 Respondent argues that the payment holdups resulted from an unnecessary and unreasonable billing practice and should consequently not be used to determine petitioner's reasonable business needs. We cannot agree. In the case of price negotiations for newly designed parts, for which no previous price existed, petitioner had no practical alternative but to refrain from billing until a price was agreed upon. Although a representative from Ford testified that petitioner could have billed on the basis of a temporary or tentative price agreement, we think it would be unreasonable to expect petitioner to have done so. Petitioner's management believed that an agreement to receive payment based upon a tentative or temporary price would adversely affect the possibility of securing a final agreement on a higher price. This appears to have been a legitimate concern and adequate justification, if justification is necessary, for petitioner's billing practice. We note that no major Ford supplier follows the practice of requesting temporary prices. During negotiations for an increase in price, petitioner withheld billing from the date of the requested increase. This practice was in response to the *336 difficulty petitioner had in its early years with respect to establishing an effective date for price increases. By withholding billing until an increase had been agreed upon, petitioner was able to secure an effective date for the increase which corresponded to the date on which the increase was first requested. Again, we note that this practice was followed by most if not all of Ford's major suppliers. Petitioner's billing practice is a matter entirely within the province of its officers and directors. Normally we would have no occasion to pass upon the reasonableness of such a practice, but since respondent has characterized petitioner's practice as unreasonable and unnecessary, we have addressed that characterization. In our view petitioner's billing practice was both reasonable and prudent. That is not to say, however, that the billing practice and resultant price holdups created a need for working capital in addition to petitioner's normal working capital needs, which we have already discussed. Concededly the price holdups put a strain on petitioner's cash position, but we feel this has been fully accounted for in our use of a peak operating cycle in computing petitioner's normal *337 working capital needs. 29 Petitioner argues that its computations avoided duplication between "normal working capital needs" and "additional working capital needs" by including the accounts receivable of its Alma Products division at their peak level in nonholdup months when it computed "normal working capital." Although this adjustment does avoid the duplication which would result from using the same figure for the accounts receivable of the Alma Products division in computing both normal working capital needs and additional working capital needs, it does not avoid other duplications inherent in the use of the two separate computations. Petitioner arrived at its figure for "additional working capital" by applying the holdup period, as a percentage of one year, to the total of the yearly expenses of its Alma Products division. Those expenses were already included in petitioner's computation of normal working capital and to that extent there remains a duplication in petitioner's computations. This duplication is illustrated by the following chart which shows that the use of both computations results in an alleged need of the Alma Products division for an amount equal to over 100 percent *338 of the yearly expenses of that division. 196719681969Petitioner's figure for operating cycleas a percentage of the year--which isapplied to yearly expenses for alldivisions in computing "normal workingcapital needs"38.936.237.4Petitioner's figure for the holdupperiod as a percentage of the year--applied to yearly expenses of the AlmaProducts division in computing"additional working capital needs"62.293.493.4Percentage of yearly expenses of AlmaProducts division claimed as areasonable need of the business--when using both of petitioner'scomputations101.1129.6130.8Furthermore, we are not convinced that petitioner had any reason at the end of 1967 to anticipate a payment holdup in 1968 equal in duration to the one which occurred in 1964. Without specific evidence to indicate that petitioner had reason to anticipate payment holdups in the next year greater in duration than those which occurred during the current year, we feel that our computation of normal working capital, using a peak operating cycle based upon the experience of the current year, *339 adequately measures petitioner's total working capital needs. 30C. Expansion and Modernization ProgramsPetitioner maintains that it was justified in retaining funds to provide for its expansion and modernization programs in the following amounts: 196719681969West Coast Program$ 1,565,000$ 1,565,000$ 1,500,000Alma ProductsModernization Program400,000225,00073,000Tomadur Program01,040,000620,000Transmission ConverterProgram0405,00060,000$ 1,965,000$ 3,235,000$ 2,253,000 Respondent believes few plans existed for any of the expansion programs set forth above. To the extent plans existed, respondent argues most were *340 too vague or indefinite to constitute reasonable needs of petitioner's business. Respondent concedes, however, that petitioner had specific, definite and feasible plans for investment in additional plant and equipment which would justify retention of funds in the following amounts: 196719681969West Coast Program(Phoenix Warehouse)$ 140,000$ 140,000$ 140,000Alma Products Moderni-zation Program100,000100,000100,000Transmission ConverterProgram (building)0256,0000$ 240,000$ 496,000$ 240,000Section 537 provides that the reasonable needs of the business include the reasonably anticipated needs of the business. This section was not intended to apply, however, where the future needs of the business are uncertain or vague or where the plans for the future use of the accumulations are indefinite. See S.Rept. No. 1622, 83d Cong., 2d Sess. 69 (1954); H. Rept. No. 1337, 83d Cong., 2d Sess. 53 (1954). Respondent's regulations reflect this congressional intent: (b) Reasonably anticipated needs. (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, *341 and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. When the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business. (2) Consideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year. Thus, subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are present at the close of such taxable year. However, subsequent events may be considered to determine whether *342 the taxpayer actually intended to consummate or has actually consummated the plans for which the earnings and profits were accumulated. In this connection, projected expansion or investment plans shall be reviewed in the light of the facts during each year and as they exist as of the close of the taxable year. If a corporation has justified an accumulation for future needs by plans never consummated, the amount of such an accumulation shall be taken into account in determining the reasonableness of subsequent accumulations. [Sec. 1.537-1(b)(1), (2), Income Tax Regs.] We must decide whether petitioner had specific and definite plans, within the meaning of the above regulation, for expansion and modernization beyond those conceded by respondent. At the outset we note that it is not necessary for the taxpayer to produce meticulously drawn formal blueprints for action. Faber Cement Block Co.,supra at 332; John P. Scripps Newspapers,supra at 469. Rather, the test is whether the proposed expansion appears to have been "a real consideration during the taxable year, and not simply an afterthought to justify challenged accumulations * * *." Faber Cement Block Co.,supra at 332. In deciding *343 whether real and serious consideration was given to proposed plans for expansion, the following factors have been considered relevant: (1) evidence of actual implementation of the plans (Faber Cement Block Co.,supra at 333, and cases cited therein); (2) when delay in implementing plans is caused by practical difficulties, whether steps have been taken to resolve those difficulties, or whether alternatives to proposed plans were actively sought out (Magic Mart, Inc.,supra); and (3) whether the corporation has a history of constant and continuous expansion (John P. Scripps Newspapers,supra). With these factors in mind, we turn to a consideration of whether petitioner's plans were sufficiently specific and definite so as to constitute reasonably anticipated needs of the business. 1. West Coast Expansion ProgramThe largest item involved in this program was the proposed establishment of an engine plant. The projected cost of establishing this plant included: (1) construction of a building, (2) equipping the building, (3) establishing an initial inventory of engine cores and component parts, and (4) carrying the initial accounts receivable. Petitioner contends that it had definite and *344 specific plans regarding the establishment of an engine plant from 1959 throughout the years in issue. We cannot agree. There is no indication in the record that petitioner ever gave any real or serious consideration to establishing this program. The only evidence we have is in the form of Tracy's testimony and in his annual reports to petitioner's board of directors. Neither the testimony nor the reports indicate anything other than Tracy's projection that petitioner might at some indefinite date in the future enter into the engine manufacturing business. We have nothing to indicate that petitioner made any effort during the period from 1959 through 1969 to locate a site for the proposed engine plant. By the time this case was tried the engine plant had not been constructed nor had any significant steps been taken in preparation for such construction. While petitioner did implement some of its plans in respect of the establishment and expansion of its West Coast division during the years 1959 through 1966, we do not believe that this alone indicates that the "plans" for the engine plant were sufficiently formed so as to present a reasonably anticipated need during the years in issue. *345 A history or general policy of growth and expansion is one of the factors to be considered, John P. Scripps Newspapers,supra, but where, as here, it is the only indication that expansion is contemplated the specificity required by the regulations is lacking. The remaining items in the West Coast program are the warehouses in Salt Lake City and Phoenix. Petitioner completed a 10,000 square foot warehouse in Phoenix in 1970 at a cost of $ 140,000. Respondent has conceded that during each of the years in issue petitioner anticipated constructing this warehouse at a cost of $ 140,000. Petitioner maintains that during the years in issue it anticipated constructing a warehouse twice the size of the one actually built in 1970 and, therefore, claims that the amount to be taken into consideration should be the $ 210,000 estimated by Tracy in 1967 as the cost of a warehouse with 20,000 square feet. We note that prior to constructing the warehouse in Phoenix, petitioner rented a warehouse with only 5,000 square feet. Other than the fact that Tracy's estimate was based upon the cost of a 20,000 square foot warehouse, we have been presented with no evidence to indicate that petitioner needed or *346 reasonably anticipated a need for a warehouse four times the size of the one it was using during the years in issue. Accordingly, we agree with respondent that the amount reasonably anticipated as the cost of constructing a warehouse in Phoenix was no more than $ 140,000. We do not believe petitioner has ever had definite and specific plans to construct a warehouse in Salt Lake City. Although petitioner claims to have had definite plans for this warehouse since 1959, it had not yet been built by the time of trial. Nor had any steps been taken in preparation for such construction. Petitioner claims that construction was delayed pending a decision by Ford as to where it would locate its depot in Salt Lake City. The only support in the record for that claim is Tracy's testimony which was to the effect that Ford had changed the location of its depot and that it was a good thing that petitioner had not constructed its warehouse prior to that time. 31 We do not know, however, when Ford changed the location of its depot or whether petitioner was aware of an impending change during the years 1967 through 1969. From the evidence we have, it is impossible to conclude that petitioner delayed *347 construction because of Ford's decision to relocate its depot. 2. Alma Products ModernizationBeginning in 1967 petitioner began an extensive modernization program with respect to its Alma Products division. The following chart compares the amounts which Tracy projected petitioner would have to spend for the years in issue with the amounts which were actually spent during those years: Projected ExpenseActualYear(as projected at the end of the prior year)Expense1967$ 244,0001968$ 400,000342,0001969225,000152,000197073,00032*348 Respondent admits that petitioner anticipated some modernization expense but he would allow only $ 100,000 as the amount reasonably anticipated at the end of each of the years in issue. Respondent's basic objection to allowing a larger credit is that petitioner failed to establish the basis for its claim that it had definite plans to spend further amounts. While it is true that the only evidence regarding the amounts petitioner anticipated spending is in the form of Tracy's projections, as to which we have no supporting data, petitioner's actual expenditures 33*350 in subsequent years came closer to the expenses projected by Tracy, than to the amounts allowed by respondent. The actual expenditures, made within a reasonable period, give substance to petitioner's claim that it had definite and specific plans to modernize its Alma Products division at a cost equal *349 to that projected by Tracy. Faber Cement Block Co.,supra;section 1.537-1(b)(2), Income Tax Regs. We believe that at the end of each of the following years petitioner reasonably anticipated spending the following amounts with respect to its modernization program: $ 400,0001968225,000196973,000 3. Transmission Converter ProgramDuring 1968 petitioner began remanufacturing transmission converters for General Motors. Petitioner claims that at the end of 1968 it reasonably anticipated spending $ 405,000 for: (1) modernization of an existing building; (2) construction of a warehouse; (3) equipment for the warehouse; and (4) transportation equipment. At the end of 1969 the transportation equipment had not been purchased and petitioner claims that at that time it reasonably anticipated spending $ 60,000 for this equipment. Again the only evidence we have that petitioner actually anticipated any of these expenditures is in the form of Tracy's projections. Petitioner actually spent $ 272,000 for the warehouse and *351 warehouse equipment during 1969, but had not made any of the other expenditures by the time of trial. The fact that the warehouse was actually built gives substance to petitioner's claim that it had specific and definite plans for its construction. Accordingly, we find that petitioner reasonably anticipated at the end of 1968 that it would need $ 306,000 (the total projected by Tracy for the warehouse and warehouse equipment) in order to construct and equip the warehouse. We are not convinced, however, that petitioner has ever had a definite and specific plan to purchase the transportation equipment. Indeed, Tracy testified that the equipment would not be purchased until petitioner's sales tripled. This indicates that petitioner had only a vague and general notion that it might at some time acquire the transportation equipment. 4. Tomadur Engine ProgramRespondent argues that the Tomadur engine operation, acquired by petitioner in 1968 and operated first through a wholly owned subsidiary (Upshur) and later as a division, was an unrelated business investment that should not be considered in a determination of petitioner's reasonably anticipated business needs. In support of this argument, *352 respondent points out that prior to 1968 petitioner had never manufactured or remanufactured engines. Respondent's own regulations indicate, however, that "[the] business of a corporation is not merely that which it has previously carried on but includes, in general, any line of business which it may undertake." Section 1.537-3(a), Income Tax Regs. We view petitioner's entrance into the business of remanufacturing engines as a logical extension of its prior business as an auto parts manufacturer. Nor does petitioner's initial operation of this business through a subsidiary indicate that it was an unrelated business investment. Respondent's regulations state: (b) If one corporation owns the stock of another corporation and, in effect, operates the other corporation, the business of the latter corporation may be considered in substance, although not in legal form, the business of the first corporation. However, investment by a corporation of its earnings and profits in stock and securities of another corporation is not, of itself, to be regarded as employment of the earnings and profits in its business. Earnings and profits of the first corporation put into the second corporation through *353 the purchase of stock or securities or otherwise, may, if a subsidiary relationship is established, constitute employment of the earnings and profits in its own business. Thus, the business of one corporation may be regarded as including the business of another corporation if such other corporation is a mere instrumentality of the first corporation; that may be established by showing that the first corporation owns at least 80 percent of the voting stock of the second corporation. If the taxpayer's ownership of stock is less than 80 percent in the other corporation, the determination of whether the funds are employed in a business operated by the taxpayer will depend upon the particular circumstances of the case. Moreover, the business of one corporation does not include the business of another corporation if such other corporation is a personal holding company, an investment company, or a corporation not engaged in the active conduct of a trade or business. [Section 1.537-3(b), Income Tax Regs.] Petitioner's ownership of Upshur met the 80 percent ownership test established by the above regulation. Upshur was operated as an instrumentality of petitioner and was not a personal holding *354 company or an investment company. Furthermore, remanufacturing engines was an active trade or business and did not constitute a passive or isolated investment unrelated to petitioner's other activities. Sandy Estate Co.,43 T.C. 361 (1964); cf. Kerr-Cochran, Inc. v. Commissioner, 253 F. 2d 121 (8th Cir. 1958), affg. a Memorandum Opinion of this Court. We hold that petitioner's business included the business carried on by Upshur and that petitioner was entitled to retain earnings to meet the reasonably anticipated needs of that business. Petitioner alleges that at the end of 1968 those needs included: (1) modernization of the existing plant on a temporary basis; (2) financing projected accounts receivable; and (3) construction of a new plant. At the end of 1968 Tracy advised the board of directors that the first two items would cost $ 420,000 and that construction of a new plant would cost $ 620,000. During 1969 petitioner spent between $ 400,000 and $ 500,000 with respect to the first two items but as of the time of trial no steps had been taken toward the construction of a new plant. Again, relying heavily on the fact that petitioner actually implemented its plans with respect *355 to the modernization of its existing plant and with respect to financing the accounts receivable, we find that it did have definite and specific plans as of the end of 1968 with respect to these two items and reasonably anticipated spending $ 420,000 in connection therewith. We have no evidence, however, of any definite plan to construct a new building. In this regard we have only Tracy's testimony, which indicates that petitioner had a general and vague notion that it might construct a new plant at some indefinite date in the future. The construction of a new building was not a reasonably anticipated need during any of the years in issue. Petitioner's reasonable needs for expansion and modernization during each of the years in issue are summarized in the following table: 196719681969West Coast Expansion(Phoenix Warehouse)$ 140,000$ 140,000$ 140,000Alma Products Modernization400,000225,00073,000Transmission ConverterProgram (warehouse)306,000Tomadur Engine Division420,000Total$ 540,000$ 1,091,000$ 213,000D. Deficiencies and Interest Asserted for Prior YearsDuring 1967 respondent audited petitioner's income tax returns for the years 1964, 1965 and 1966. In December 1967 petitioner *356 received notice pursuant to section 534(b) of a proposed deficiency for those years which included an amount in respect of the accumulated earnings tax. The notice of deficiency was issued in March 1968, asserting total deficiencies of $ 1,942,071.09. In 1970 petitioner paid $ 500,000 in settlement of the deficiencies asserted for the years 1964 through 1966. Petitioner maintains that during each of the years 1967 through 1969 it needed to retain a portion of its available funds to provide for the tax deficiencies and interest asserted for prior years. Respondent raises three objections to petitioner's position. First, respondent argues that since the notice of deficiency for the prior years was not issued until March 1968, petitioner could not have reasonably anticipated the need in 1967. Secondly, while respondent concedes that the portion of the deficiency relating to the accumulated earnings tax for the prior years was a reasonably anticipated need in 1968 and 1969, he maintains that the portion of the deficiency relating to the income tax for prior years was not such a need. Finally, respondent argues that the interest accruing on the deficiencies for prior years was not a reasonably *357 anticipated need because it was contingent upon a contingent tax, the burden of which would be mitigated by its deductibility in some future year. We will deal with respondent's objections in the order presented. We cannot agree that petitioner could not have reasonably anticipated the deficiency in 1967, merely because the notice of deficiency was not issued until March 1968. Respondent's agent conducted the audit during 1967 and informally apprised petitioner that a deficiency would be asserted. Furthermore, in December 1967, petitioner received formal notice of a proposed deficiency pursuant to section 534(b). We have long recognized that a contingent liability is a reasonable need for which a business may provide. Bremerton Sun Publishing Co.,supra;John P. Scripps Newspapers,supra;William C. Atwater & Co.,10 T.C. 218 (1948). It is the likelihood of the occurrence of the contingency which determines whether it is reasonably anticipated. Smoot Sand & Gravel Corp. v. Commissioner,supra; J. Gordon Turnbull, Inc.,41 T.C. 358, 375 (1963), affd. 373 F. 2d 87 (5th Cir. 1967). From petitioner's point of view it was just as likely in December 1967 that it would eventually have to *358 pay the deficiency as it was in March 1968 when the notice of deficiency was issued. After having been both informally and formally notified of the proposed deficiency, petitioner's ultimate liability was a realistically foreseeable contingency constituting a reasonable need of the business. Nor do we agree with respondent's assertion that the contingent income tax liability for prior years was not a reasonable need of the business during the years in issue. Respondent points out that an accrued income tax is an adjustment to taxable income in computing accumulated taxable income pursuant to section 535(b)(1) but that a contested income tax is not permitted as an adjustment under section 535(b)(1). See section 1.535-2(a)(1), Income Tax Regs. Respondent's position is that by allowing the contested income tax as part of the credit in section 535(c) we would defeat the elimination of that item as an adjustment under section 535(b)(1). We see two fallacies in respondent's argument. First, as earlier mentioned, a determination of a corporation's reasonable business needs is important in two respects: (1) in order to determine whether earnings and profits (in the form of liquid assets) have *359 been permitted to accumulate beyond the reasonable needs of the business, thus invoking the presumption of a tax avoidance purpose under section 533; and (2) in order to determine the amount of the credit for the reasonable needs of the business under section 535(c) in computing accumulated taxable income, the base against which the tax is applied once the prohibitive purpose has been found. At this point we are merely trying to determine whether earnings and profits have been accumulated beyond petitioner's reasonable business needs for the purpose of determining whether the presumption under section 533 applies. We do not reach the question of whether a credit is available under section 535(c) until the prohibited purpose has been found. Therefore, at this stage of our consideration, the purported inconsistency in allowing a credit under section 535(c) for a contingent income tax liability, when an adjustment for that liability would not be permitted under section 535(b)(1), is not relevant. Our only inquiry at this point is whether the contingent income tax liability was a reasonable business need. That determination should be made according to the same standard used with respect *360 to any other contingent liability: the likelihood of the occurrence of the contingency. Using this standard we believe there is no question but that the contingent income tax, like the contingent accumulated earnings tax, was a reasonably anticipated need during each of the years in question. 34Secondly, we do not agree that the contested income tax should not be included in the credit under section 535(c) on the ground that such inclusion would defeat the elimination of the contested tax as an adjustment under section 535(b)(1). That section operates independently of section 535(c) and does not impliedly prevent contested income tax deficiencies from being taken into account in determining a taxpayer's needs for purposes of the section 535(c) credit. Respondent has conceded in Rev. Rul. 70-301, 1970-1 C.B. 138, that although the accumulated earnings tax is not a permitted adjustment under section 535(b)(1), such tax may nevertheless be included within the credit for the reasonable needs of the business under section 535(c). This appears to be a recognition on respondent's part *361 that sections 535(b)(1) and 535(c) operate independently of one another and that inclusion of an item within the section 535(c) credit should not be precluded by the fact that an adjustment under section 535(b)(1) is not permitted with respect to that item. The credit for the reasonable needs of the business was added to the Internal Revenue Code in 1954. In explaining the credit the Senate Finance Committee stated: Your committee has provided that this tax is to be imposed only on the amount unreasonably accumulated because it sees no justification for imposing a penalty tax on accumulated earnings to the extent that the earnings were needed in the business. It is believed that it is this aspect of the tax which taxpayers find particularly alarming, because, while they may be confident that they can justify the accumulation of most of their earnings, they may feel less certain about a minor portion of their accumulations and fear that this will subject their entire accumulated earnings to tax. [S. Rept. No. 1622, 83rd Cong., 2d Sess. 72 (1954).] We have concluded that the contested income tax was a reasonable need of the business. Congress clearly intended that any amount of current *362 income retained in order to meet the reasonable needs of the business should not be subject to the accumulated earnings tax. The contested income tax, as a reasonable need of the business, is eligible for inclusion within the section 535(c) credit. We are not suggesting that a taxpayer can use an accrued income tax as an adjustment under section 535(b) 1) and as part of the credit under section 535(c) for the same year. That would obviously represent a double deduction of the same item in arriving at accumulated taxable income for that year. But in computing accumulated taxable income for two separate years, there is no duplication when an item is included within the section 535(c) credit in one year and is treated as an adjustment under section 535(b)(1) in a later year. Accumulated taxable income is a statutory device designed to represent the amount of income for the year which is actually available for distribution. See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.09, p. 8-31. To the extent income of one year is needed for future use in the business it is not available for distribution and is not included in accumulated taxable income for *363 that year by virtue of section 535(c). In a later year when the business need (which prompted the prior accumulation) is met, the income available for distribution in that year is reduced. This reduction will normally be reflected in a deduction from gross income in arriving at taxable income-- the starting point in computing accumulated taxable income (as for example, under section 162 for a business expense or under section 167 for depreciation on a building, the anticipated cost of which prompted prior accumulations). Federal income tax, however, is not permitted as a deduction from gross income, but nevertheless represents a reduction in income available for distribution. Recognizing this, Congress provided that Federal income tax should be deducted from taxable income in computing accumulated taxable income. That adjustment should be available in the year the liability accrues, even though the liability was included in the section 535(c) credit for a prior year, just as a depreciation deduction is used to reduce income in a later year even though the anticipated cost of the item being depreciated was included in the section 535(c) credit for a prior year. Although we have concluded *364 that the contested income tax is eligible for inclusion in the section 535(c) credit, we must reserve for later consideration whether petitioner is entitled to such a credit for any of the years here involved. That determination requires a comparison of all of petitioner's reasonable needs with the amount of prior accumulations available to meet those needs. Finally, we agree with petitioner that the interest running on the deficiency for prior years was also a reasonable need of the business. Respondent concedes that at all times during 1967, 1968 and 1969 he claimed interest from the date the return was due until payment of the tax with respect to both the income tax and accumulated earnings tax. 35 In light of respondent's position during these years, we think prudent judgment justified petitioner's anticipation of the interest associated with the asserted deficiency. The fact that a deduction would be available under section 163 for some future year has no relevance in determining whether the interest asserted by respondent constituted a reasonable need of petitioner's business during the years in issue. A similar argument could be made with respect to any anticipated expense which *365 would be deductible in the year incurred, but we are not aware of any cases holding that the potential deduction mitigates the need to accumulate funds in anticipation of the expense. Petitioner's needs in this regard are indicated by the following table (all numbers being rounded to the next lowest dollar): 36*366 196719681969Deficiency asserted for 1964$ 576,251$ 576,251$ 576,251Interest accrued from 3-15-66to 12-31 to current year96,715131,290165,865Deficiency asserted for 1965687,169687,169687,169Interest accrued from 3-15-66to 12-31 of current year74,101115,331156,561Deficiency asserted for 1966678,649678,649678,649Interest accrued from 3-15-67to 12-31 of current year32,46373,181113,899Total$ 2,145,348$ 2,261,871$ 2,378,394 Having determined petitioner's reasonable business needs, including reasonably anticipated needs, for the years in issue, we can now compare those needs to petitioner's accumulated earnings and profits, as reflected in net liquid assets. The following chart sets forth that comparison: Net LiquidOperatingIncrease inAssets AvailableExpensesYearAccumulatedEarnings andto Meetfor OneEndingEarningsProfitsAnticipatedOperating CycleDec. 31and ProfitsOver Prior YearsBusiness Needs(Working Capital)1966$ 11,682,806196713,002,887$ 1,320,081$ 10,618.752$ 3,826,812196814,203,4461,200,55910,400,3716,969,980196914,851,710648,26411,539,7357,303,285Total NeedsYearExpansion andPrior Taxof BusinessExcess ofEndingModernizationDeficiencies(Col. 4 + Col. 5Liquid AssetsDec. 31Plans(Including+ Col. 6)Over NeedsInterest)19661967$ 540,000$ 2,145,348$ 6,512,160$ 4,106,59219681,091,0002,261,87110,322,85177,5201969213,0002,378,3949,894,6791,645,056It *367 is clear from the above chart that during each of the years in issue petitioner permitted its earnings and profits to accumulate beyond its reasonable business needs. Petitioner has presented no evidence, nor made any argument toward overcoming the presumption created by section 533 that such accumulation is indicative of a purpose to avoid tax at the shareholder level. Rather, petitioner relies solely on its claim that earnings and profits were not accumulated beyond the reasonable needs of its business. Having found to the contrary, we have no alternative but to agree with respondent that petitioner was availed of during the years in issue for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings and profits to accumulate instead of being divided or distributed. The tax imposed by section 531 is, therefore, appropriate and will be applied to petitioner's accumulated taxable income, as defined in section 535, for each of the years in issue. We now turn to the question of whether and to what extent petitioner is entitled to a credit for the reasonable needs of its business under section 535(c) in computing accumulated taxable income. Petitioner *368 maintains that it is entitled to a credit equal to the total amount of its reasonable business needs. Respondent has determined that no credit is available. The credit provided by section 535(c) is equal to such part of the earnings and profits for the taxable year as is retained for the reasonable needs of the business. Thus the credit is not equal to the total amount of reasonable business needs, but equals only that portion of current earnings and profits as is retained for the reasonable needs of the business. Furthermore, in determining the amount of current earnings and profits retained for the reasonable needs of the business, the accumulated earnings and profits of prior years must be taken into consideration. If the accumulated earnings and profits of prior years are sufficient for the reasonable needs of the business, then any earnings and profits of the current taxable year which are retained are not retained for the reasonable needs of the business. Section 1.535-3(b)(1)(ii), Income Tax Regs. The critical question is whether at the end of each year petitioner had accumulated earnings and profits, as reflected in net liquid assets, available to meet its reasonable business *369 needs without retaining any portion of its current earnings and profits. Golconda Mining Corp.,supra. This determination can be made by subtracting from the year end figure for net liquid assets, the amount of current earnings and profits, and by comparing the remainder with the figure for the reasonable needs of the business. To the extent that net liquid assets (less current earnings and profits) exceed the reasonable needs of the business there was no need to accumulate current earnings and profits for those needs. This comparison for the years in issue is illustrated by the following chart: 196719681969Earnings and profitsreflected in netliquid assets$ 10,618,752$ 10,400,371$ 11,539,735Less current earnings37*370 and profits 1,320,0811,200,559648,264Prior accumulationavailable for reason-able business needs9,298,6719,199,81210,891,471Reasonable businessneeds6,512,16010,322,8519,894,679Excess of prioraccumulation overreasonable needs$ 2,786,511($ 1,123,039)$ 996,792 Thus it appears that only in the year 1968 did petitioner need to accumulate any portion of its current earnings and profits for the reasonable needs of its business. 38 As for the years 1967 and 1969, petitioner's prior accumulations were sufficient to meet its reasonable needs without the necessity of retaining current earnings. Issue 2: Unreasonable CompensationSince 1947 Tracy has been compensated in the form of a salary amounting to *371 $ 9,000 per year plus ten percent of petitioner's net profit before taxes. In addition to salary, Tracy has received profit sharing benefits. During the years here in issue Tracy received as compensation the following amounts: Basic CompensationProfit Sharing PlanTotal Compensation1967$ 283,415$ 46,085$ 329,5001968307,90640,588348,4941969262,28543,780306,065Respondent has determined that payments to Tracy in excess of $ 150,000 per year were excessive and unreasonable within the meaning of section 162. Respondent's determination is presumptively correct and petitioner has the burden of proving otherwise. Botany Mills v. United States, 278 U.S. 282(1929); Rule 142(a), Tax Court Rules of Practice and Procedure.Petitioner maintains that in the case of a contingent compensation arrangement, reasonableness is determined at the time the arrangement was entered into, rather than at the time the compensation was actually paid, citing Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115 (6th Cir. 1949), reversing a Memorandum Opinion of this Court; American Foundry, 59 T.C. 231 (1972); Streckfus Steamers, Inc.,19 T.C. 1 (1952); California Vegetable Concentrates, Inc.,10 T.C. 1158 (1948); section 1.162-7(b)(2), Income Tax Regs.*372 According to petitioner the best indication of the reasonableness of the compensation paid to Tracy is that it was paid pursuant to an arm's-length negotiated agreement freely entered into between petitioner and Tracy. We are not convinced, however, that this compensation arrangement was the result of an arm's-length free negotiation between unrelated parties. When this arrangement was entered into in 1947, 75 percent of petitioner's stock was owned by Tracy and members of his family. The board of directors at that time consisted of Tracy, his wife, Paul Trigg (petitioner's attorney), Katherine Rolley (unrelated to Tracy), and Elmer Rolley (unrelated to petitioner). We believe these factors indicate the lack of an agreement freely negotiated at arm's length. 39*373 See Charles Schneider & Co., Inc. v. Commissioner, 500 F. 2d 148 (8th Cir. 1974), affirming a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975); Hammond Lead Products, Inc., v. Commissioner, 425 F. 2d 31 (7th Cir. 1970), affirming a Memorandum Opinion of this Court; University Chevrolet Co.,16 T.C. 1452 (1951), affd. 199 F. 2d 629 (5th Cir. 1952). Since we cannot rely on the fact of an arm's-length negotiation to establish the reasonableness of the compensation arrangement, we must look to other factors. The relevant criteria as set forth in Mayson, supra at 119, are: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; *374 the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * The record is completely barren of any facts regarding Tracy's qualifications for employment or regarding the nature, extent and scope of his work. We know that he served as president, chief executive officer, treasurer and financial officer of petitioner during the years in issue. Although Tracy testified at length, he never indicated the nature or extent of his duties in these various capacities. Our findings set forth comparisons of Tracy's salary with petitioner's before tax and after tax income, and with distributions to shareholders. We note that dividends from 1947 through 1969 total only $ 2,210,071 while Tracy's salary for the same period totals $ 4,069,444. Petitioner presented no evidence from which a comparison can be drawn between Tracy's compensation and that of other corporate executives of comparable concerns. We can, however, make a comparison of Tracy's compensation with that of the next six highest paid employees of petitioner. Combining their salaries for *375 each of the years at issue shows that together they received about one-half the amount of compensation received by Tracy. Year40Six Employees 40Emmet E. Tracy 1967$ 147,880$ 329,5001968156,037348,4941969157,304306,065After due consideration of the relevant factors in light of the dearth of evidence, we must conclude that petitioner has not overcome the presumption in respondent's favor on this issue. Issue 3: Charitable ContributionIn January 1967 petitioner donated various items of machinery to the Salvation Army. For the purpose of computing its charitable contribution deduction, petitioner valued the donated machinery at $ 121,049. In the notice of deficiency respondent valued the machinery at $ 42,985. After trial, however, respondent was permitted to amend his answer to assert that the donated machinery was worth only $ 3,500. The parties agree that the burden of proof is upon petitioner to show that the fair market value was in excess of $ 42,985 and that the burden is upon respondent to show a fair market value less than that amount. See Rule 142(a), Tax Court Rules of Practice and Procedure.Respondent's *376 regulations indicate that in the case of a contribution of property, the amount of the deduction is determined by the fair market value of the property. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * * [Section 1.170-1(c)(1), Income Tax Regs.] The fair market value of the donated machinery is a question of fact to be resolved upon a consideration of all the evidence. Daniel S. McGuire, 44 T.C. 801 (1965). The evidence here consists of: the appraisal secured by petitioner from Manufacturers; the sale of the machinery by the Salvation Army shortly after the date of contribution for $ 3,500; and the ultimate sale by Lynch or, in the case of items not sold by Lynch, his opinion as to their value. We place very little probative value on the appraisal relied upon by petitioner. Courtemanche, who inspected the machinery, was not available to testify. The only testimony we had in support of this appraisal was from a representative of Manufacturers who testified as to the procedures used by Manufacturers in *377 arriving at an appraisal. That testimony indicates that, although Courtemanche inspected the machinery, he did not estimate its fair market value. The determination of fair market value was made by another individual based upon notes made by Courtemanche. We have carefully reviewed those notes and believe that they fail to constitute a sufficient basis upon which an accurate determination of fair market value could have been made. Nor do we believe that the bulk sale of the machinery by the Salvation Army for $ 3,500 is a fair indication of market value. The difficulty in relying on this sales price is that it was the price paid by a dealer in a forced bulk sale of the machinery. The Salvation Army had no interest in the machines but was interested in converting them into cash at the earliest possible date. Prices obtained at forced sales are not always the best criterion of value. McGuire, supra.Furthermore, where a charitable contribution is made in property, the allowable deduction is the fair market value determined according to the price an ultimate consumer would pay rather than what might be paid by a dealer buying for purposes of resale. 41Goldman v. Commissioner, 388 F. 2d 476 (6th Cir. 1967), *378 affg. 46 T.C. 136 (1966). The best evidence in this case of the fair market value of the machinery is the price at which it was ultimately sold by Lynch. We recognize that in some instances these sales were several years removed from the date of contribution; yet in light of our findings regarding the value of petitioner's evidence, we have little choice *379 but to rely on these ultimate sales figures. As to the items which had not been sold at the time of trial, we have Lynch's opinion as to their value in January 1967. Petitioner does not object to Lynch's qualification to testify regarding value, but argues that its own appraisal, based on a contemporaneous examination, deserves more weight. Normally, we would agree with petitioner, but given the quality of petitioner's contemporaneous appraisal we cannot agree in this instance. In our opinion the fair market value of the machinery in January 1967 was $ 30,760. Decision will be entered under Rule 155. Footnotes1. Pursuant to an amendment to conform his answer to the proof, respondent increased the deficiency for 1967 to $ 685,978.67. Respondent agrees that the burden of proof as to the increase rests upon him.↩2. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩3. As far as we can discern, "remanufacturing" an auto part is essentially the same as rebuilding or reconditioning an auto part. The parties may have intended to use these terms interchangeably, but where petitioner or any of its divisions has been specifically described as a remanufacturer, we have used that term.4. Tentative billings are those sales recorded on petitioner's books representing shipments to Ford of newly designed parts where a price has not been agreed upon. The amounts shown are compiled by using petitioner's original price quotations to Ford. No actual billings were made to Ford until a final price was agreed upon.↩5. The items set forth in Tracy's 1959 estimate which had been completed by the end of 1969 were: 1. Los Angeles warehouse - completed in 1962. 2. Small parts remanufacturing plant in Los Angeles completed in 1963 and leased to petitioner's subsidiary, Snow Manufacturing Company. 3. Warehouse in San Leandro, Calif., completed in 1965. 4. Small parts core and float requirements completed 1960-1968.↩6. Tracy's annual report to petitioner's board of directors for 1968 indicated a total projected cost of $ 1,315,000. This did not include, however, estimates with respect to establishing initial inventories for the engine plant, nor an estimate of the investment required to carry accounts receivable with respect to the engine plant. If the costs of these items, as projected in 1967, are added to the 1968 projected costs, the total becomes $ 1,565,000. ↩7. The projected costs of the two warehouses was $ 65,000 less in the 1969 annual report than in the 1968 annual report. As to the difference between the total projected costs as included in the 1969 annual report, and as claimed by petitioner here, see the explanation in footnote 6, above, regarding inventories and accounts receivable.8. Petitioner arrives at this figure by subtracting from the total projected expenditures for this program ($ 691,000), the amount spent during 1968 ($ 286,000). ↩9. This figure represents the cost of the transportation equipment as projected in Tracy's 1968 report.↩10. Tracy's 1969 report to the board of directors did not project any expense for modernization for 1970; nor did Tracy testify that he made any such projection at the end of 1969. Tracy did estimate at the end of 1968 that petitioner would need to spend $ 225,000 to complete the modernization program. Since only $ 152,000 was spent during 1969, petitioner claims that the difference of $ 73,000 remained a reasonably anticipated need as of the end of 1969.↩11. Alma Piston Co.,T.C. Memo. 1963-195↩.12. Includes $ 1,000,000 of securities which were included in petitioner's financial statements as "other assets" but which were stipulated to be the equivalent of cash. ↩13. Includes items listed on 1969 financial statement as "Other expenses" and "Michigan Income tax."↩14. Includes salary, bonuses and profit sharing benefits but does not include pension plan contributions.↩15. The parties have stipulated a list of the items of machinery which were donated to the Salvation Army. The appraisal which Manufacturers submitted to petitioner included an item described by "Michigan Tool Co. * * * gear finishing tool." This item is not included on the list stipulated by the parties. Manufacturers appraised this item at $ 375. Manufacturers' total appraisal of the items which the parties have stipulated as having been donated was $ 120,674.19. The only information presented with respect to this item was Manufacturers' appraisal and the price at which it was sold by Lynch.↩16. Indicates Lynch's recollection as to sales price. ↩17. Indicates Lynch's opinion as to value in January 1967. 18. Indicates the item was scrapped. ↩20. Bardahl Manufacturing Corp.,T.C. Memo. 1965-200↩.21. Computed by using monthly averages for inventory and accounts receivable. ↩22. Normally a peak operating cycle is determined by using the figures for inventory and accounts receivable for the one month in which the combined level of the two is at its highest. See Kingsbury Investments, Inc.,T.C. Memo. 1969-205. However, since petitioner maintains it required additional working capital, computed without regard to the Bardahl formula, to pay the expenses of the Alma Products division during payment holdups from Ford, it has included the accounts receivable of its Alma Products division during holdup months at their peak level in nonholdup months, for purposes of determining the one month in which the sum of inventory and accounts receivable was highest.23. For other cases in which we approved the use of a peak operating cycle for purposes of computing working capital needs, see Walton Mill, Inc.,T.C. Memo. 1972-25; Kingsbury Investments, Inc.,supra;Alabama Coca-Cola Bottling Co.,T.C. Memo. 1969-123; Bardahl International Corp.,T.C. Memo. 1966-182. For cases in which we approved the use of an average operating cycle for purposes of computing working capital needs, see W. L. Mead, Inc.,T.C. Memo. 1975-215; Mimmac Corp.,T.C. Memo. 1972-96. In Mead,supra,↩ we indicated that because the taxpayer's monthly revenues substantially exceeded its monthly expenses and because monthly cash balances were two to four times as great as its current expenses, use of a peak operating cycle was not justified. Although we do not have figures regarding petitioner's monthly revenues we note that petitioner's monthly cash balances were not substantially in excess of monthly expenses. In fact, the monthly expenses (including accounts payable) exceeded the cash balances during four months in 1967, five months in 1968, and six months in 1969.24. See also, W. L. Mead, Inc.,supra;Kingsbury Investments, Inc.,supra;Bardahl International Corp.,supra.↩25. The parties agree that when peak figures are used the amounts should be for the one month in which the combined level of inventory and accounts receivable is at its highest. See Kingsbury Investments Inc.,supra. We have accordingly used the figures for February 1967, November 1968 and February 1969. We have not adjusted peak accounts receivable for the Alma Products division (as did petitioner--see footnote 22) because of our holding, infra,↩ that petitioner did not have a need for additional working capital as a result of the payment holdups from Ford. 26. Respondent used the figures for cost of goods sold which appeared in petitioner's financial statements. Those figures included the amounts by which petitioner had depreciated its assets for financial accounting purposes. Since the objective of this computation is to determine the amount of cash needed to finance petitioner's activities during an operating cycle, we agree with petitioner that depreciation, a noncash item, should not be included within cost of goods sold. See Faber Cement Block Co.,supra at 331. We have accordingly subtracted from the figures appearing in petitioner's financial statements for cost of goods sold, the depreciation which had been included therein. 27. We have subtracted selling discounts from the figures appearing in petitioner's financial statements for net sales. These discounts were treated in the financial statements as expenses. Since the discounts represent noncash expenditures, we believe they should be treated as offsets to sales rather than as expenses for purposes of this computation. ↩28. We have adjusted the figures appearing in petitioner's financial statements by: (a) subtracting depreciation not related to the cost of goods sold and not subtracted above. (b) subtracting selling discounts which were treated in the financial statements as expenses, but which we have treated as offsets to sales. (c) adding the president's compensation. Since this amount was based on before tax profits, it was listed as a separate item in petitioner's financial statements and was not included in the totals used by respondent.↩29. This computation took into account petitioner's peak accounts receivable, including the accounts receivable of the Alma Products division.↩30. Petitioner also relies on our decision in Alma Piston Co.,T.C. Memo. 1963-195, wherein we upheld petitioner's claim that it needed working capital to cover expenses incurred during payment holdups. In that case, however, we made no computation of "normal working capital" under the Bardahl↩ approach. Our decision here is not inconsistent with our decision there. We fully recognize the effect of the periodic payment holdups on petitioner's cash position, but we feel the need created by these payment holdups is fully reflected in our computation of "normal working capital."31. Tracy's testimony explaining the delay in constructing the Salt Lake City warehouse was: The reason for that is that Ford Motor -- we were supposed to be kind of near -- or, we'd like to be, and they'd like to have us near their depot. They moved their Salt Lake City depot from one side of the city way over to the other side, and it was a good thing we didn't build the plant earlier, or we wouldn't have been where we ought to be.↩32. Petitioner's brief indicates that $ 300,000 was spent on this program during 1970. The only support in the record for that statement is a sentence appearing in Tracy's 1970 report to the board of directors which says, "During 1970 we spent $ 300,000 for new equipment." The audited financial statements, stipulated by the parties, indicate that the total amount spent for new equipment for petitioner's Alma Products division during 1970 was $ 140,884. We have no way of determining, however, what portion of this related to the modernization program as contemplated in 1969.33. In his reply brief, respondent objected to Tracy's testimony regarding the amounts spent in the modernization program. The basis for this objection is that total expenditures, testified to by Tracy, for modernization and for the transmission converter program exceeded the amounts listed as "asset additions" in the audited financial statements for petitioner's Alma Products division. If it is assumed that the transmission converter program was undertaken solely by the Alma Products division, there would appear to be a consflict between Tracy's testimony and the stipulated financial statements. However, as we said in our findings of fact, it is not clear from the record whether the Alma Products division or the GPD Midwest division, or both, were responsible for the transmission converter program. As both divisions were located in the same building, it is entirely possible that expenditures listed in the financial statements for one division actually benefitted both divisions. We note that the total amounts listed under "asset additions" in the financial statements for both divisions very closely approximate the total amounts which Tracy testified were spent on these two programs. Tracy's testimony is, therefore, not necessarily in conflict with the financial statements. We found that testimony credible and are unable to agree with respondent on this point.34. See Road Materials, Inc.,T.C. Memo. 1967-187, remanded on another issue 407 F. 2d 1121↩ (4th Cir. 1969).35. In 1972 respondent changed his position with respect to interest on the accumulated earnings tax. See Rev. Rul. 72-324, 1972-1 C.B. 399↩, which indicates that no interest is due on the accumulated earnings tax if it is paid within ten days from the date of notice and demand therefor.36. Interest has been computed on the full amount of the asserted deficiency. It was not until 1972 that the respondent conceded that interest does not begin to run on an accumulated earnings tax deficiency until a final determination of liability. See Rev. Rul. 72-324, 1972-1 C.B. 399↩. Interest for the part year from March 15 to December 31, 1964, 1965 and 1966, a period of 291 days, has been computed at a rate determined as follows: .06 X 291/365 =.047836.37. The parties have stipulated figures for accumulated earnings and profits at the end of each of the years 1966, 1967, 1968 and 1969. We have used as current earnings and profits for each year the increase in accumulated earnings and profits over the prior year. In doing this we make the assumption that the stipulated figures for accumulated earnings and profits have been adjusted for the amount of dividends paid during each year. Section 535(c)(1) indicates that "the amount of the earnings and profits for the taxable year which are retained is the amount by which the earnings and profits for the taxable year exceed the dividends paid deduction." If the stipulated figures do not contain this adjustment, proper adjustment can be made in the Rule 155 computation.38. Since the amount retained for the reasonable needs of the business must be reduced by the deduction allowed in section 535(b)(6), we leave the actual computation of the credit for the Rule 155 computation.↩39. Petitioner relies on two memorandum opinions of this Court, R.J.M. Co., T.C. Memo., June 13, 1946, and North Carolina Equipment Co.,↩ T.C. Memo., June 4, 1945, for the proposition that Tracy's control of petitioner is irrelevant in determining whether the compensation arrangement resulted from arm'slength negotiations. In both of these cases we held that because of other factors, the arrangement between the employee and employer was freely negotiated in spite of the fact that the employee owned a controlling interest in the employer. We see no such other factors here as would allow us to disregard the fact of Tracy's control over petitioner.40. These figures include benefits received pursuant to a profit sharing plan.↩41. In this regard we note respondent's regulations regarding the determination of fair market value for purposes of the estate tax: The fair market value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate. Thus, in the case of an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail. * * * [Section 20.2031-1(b), Estate Tax Regs.]↩